423 S.E.2d 560

**Raymond A. HINERMAN, Plaintiff Below, Appellee,**

v.

**The DAILY GAZETTE COMPANY, INC., Defendant Below, Appellant.**

**No. 20489.**

Supreme Court of Appeals of West Virginia.

Submitted June 2, 1992.

Decided July 15, 1992.

---

Rudolph L. DiTrapano, Charleston, Rebecca A. Baitty, Sarasota, Fla., for appellant.

Harry P. Waddell, Gordon H. Copland, Steptoe & Johnson, Clarksburg, for appellee.

NEELY, Justice:

This is a libel case against *The Charleston Gazette* in which the plaintiff, Raymond Hinerman, recovered $75,000 in actual damages and $300,000 in punitive damages. We affirm.

## BACKGROUND

Sam Levin is a Russian immigrant who came to the United States in 1975 and moved to Wheeling in 1977. Mr. Levin was trained as a mining engineer in Russia and he found work in West Virginia as a miner. While working, Mr. Levin suffered a heart attack. Mr. Levin filed a Workers' Compensation claim and was represented by legal counsel for District 6 of The United Mine Workers (UMW) free of charge. At that time, the UMW's lawyer was Raymond Hinerman, the appellee in the case before us.

Mr. Levin's Workers' Compensation claim was contested on several grounds. There was some question concerning whether: (1) Mr. Levin had a preexisting heart condition; (2) the heart condition arose from and in the course of Mr. Levin's employment; and (3) the condition produced permanent total disability. The initial determination was that a 20 percent award would fully compensate Mr. Levin for his work-related injury.

Mr. Levin protested the initial 20 percent award, and while his appeal was being processed, District 6 of the UMW replaced Raymond Hinerman with Craig Broadwater as their lawyer. Mr. Broadwater suggested to Mr. Levin that he retain Mr. Hinerman privately because of Mr. Hinerman's experience with complex Workers' Compensation cases.

Mr. Broadwater made clear to Mr. Levin that private representation by Mr. Hinerman would not be free, and in fact, Mr. Broadwater showed Mr. Levin a copy of the West Virginia statute on lawyers' fees in Workers' Compensation cases. Mr. Levin then requested the services of Mr. Hinerman as his private lawyer. There followed conversations and a signed, written contract setting forth the terms under which Mr. Hinerman agreed to act as Mr. Levin's lawyer. The contract into which the two parties entered was a standard contingent fee contract that called for Mr. Hinerman to receive 20 percent of all compensation awarded Mr. Levin for a period of 208 weeks. This was the maximum fee allowed by statute.

While the appeal of Mr. Levin's case to the Workers' Compensation Appeal Board was being prepared, Mr. Levin moved to Florida. Mr. Levin remained in constant communication with Mr. Hinerman through collect telephone calls to him. After Mr. Hinerman had presented his oral argument before the Workers' Compensation Appeal Board, the appeal board increased Mr. Levin's award to total permanent disability. Mr. Levin's employer did not appeal. On 8 June 1982, the commissioner directed payment to Mr. Levin of $19,782.38 in back benefits and a monthly stipend of $1,162.38.

Without informing Mr. Hinerman, Mr. Levin telephoned and sent a telegram to the Workers' Compensation commissioner revoking the commissioner's authority to honor Mr. Hinerman's demand for attorneys' fees. When Mr. Hinerman learned of this, he sent a letter demanding 20 percent of the award to date. After six weeks of repeated demands for payment pursuant to his contract, Mr. Hinerman sued Mr. Levin.

When Mr. Levin failed to answer, Mr. Hinerman moved for a default judgment, with notice to Mr. Levin that a hearing would be held on that motion on 14 October 1982. On 8 October 1982, the circuit court

received a letter from David Gold, Esq., requesting a continuance and stating that he had just been contacted by Mr. Levin but had not yet agreed to act as counsel. At the 14 October 1982 hearing, Mr. Hinerman's motion was granted, but Mr. Levin was given an additional ten days to assert *bona fide* defenses. When Mr. Levin did not avail himself of that opportunity, a default judgment as to liability was entered on 27 October 1982. On 29 October 1982, Mr. Gold, who agreed finally to represent Mr. Levin, sent a letter to the Circuit Court of Hancock County seeking another continuance while he conferred with Mr. Levin's Florida counsel. Meanwhile, Mr. Hinerman gave notice to all the parties of a hearing set for 16 November 1982 for an attachment. On 4 November 1982, the clerk of the circuit court received a letter of general denial from Mr. Levin but neither the circuit judge nor Mr. Hinerman saw a copy of that letter. On 8 November 1982, Mr. Levin's counsel, Mr. Gold, advised the court by letter that he had not yet concluded arrangements with Mr. Levin concerning his employment. At the 16 November 1982 hearing, Mr. Levin's written motion to set aside the default judgment was delivered by another lawyer, Arch Riley, Jr., Esq., and the motion was denied by the circuit court. Finally, on 3 December 1982, Mr. Gold filed another motion to vacate the default judgment giving notice of a hearing to be held on 16 December 1982. On that date, the trial court conducted a full hearing and issued findings of fact and conclusions of law in a memorandum of opinion, and entered an order denying the motion.

Mr. Levin, through his lawyer Mr. Gold, then filed a petition in this Court appealing the 17 May 1983 circuit court order. The libelous editorial in *The Charleston Gazette* that is the subject of this appeal arose from the allegations in the petition filed by Mr. Gold. We granted Mr. Levin's appeal, and on 13 December 1983 entered an order affirming the circuit court in all matters except that we allowed Mr. Levin a $600 credit against his fee with Mr. Hinerman, based upon monies paid to Mr. Hinerman while Mr. Hinerman was employed by District 6 of the United Mine Workers. *See,*

*Hinerman v. Levin,* 172 W.Va. 777, 310 S.E.2d 843 (1983).

On 20 May 1983, *The Charleston Gazette* published the following editorial:

### LAWYER ETHICS

The State Bar ethics committee which guards against lawyer misconduct—and also the Judicial Inquiry Commission which watches over judges—should keep an eye on a current state Supreme Court case.

It involves a sick immigrant miner who won disability payments, but his lawyer took every penny, getting $12,000 for one day's work. (The lawyer said the old man was lucky because $1,000 of the miner's legal expense was billed to a different client). A judge allowed it to happen because a letter from the immigrant didn't meet proper legal form.

Allegations before the high court:

Sam Levin, a Russia native, moved to Wheeling and worked for Consolidation Coal Co. until he suffered a heart attack. UMW attorney Ray Hinerman, paid by the union, represented Levin free before the Workers' Compensation Fund. The miner was granted 20 percent disability.

Hinerman quit the UMW and represented Levin privately in an appeal. After a one-day hearing, Levin was granted 100 percent disability. Hinerman sent the ex-miner a bill for $4,202. Levin didn't pay. The lawyer sued in Hancock County Circuit Court, demanding $12,088.

Levin wrote a letter to Judge Callie Tsapis saying he couldn't afford to hire another lawyer to answer the suit, but felt he owed Hinerman nothing. "I am convinced that Mr. Hinerman used my ignorance and lack of skill in language and law to his advantage." Ms. Tsapis ruled that the letter didn't constitute a legal reply. She gave Hinerman a default judgment and allowed him to seize 100 percent of Levin's Workers' Compensation benefits.

A different lawyer came to Levin's aid and appealed to the Supreme Court. The

petition says Hinerman, incredibly, testified that he did the old miner a favor by billing $1,000 worth of Levin's expenses to another client.

The case hasn't been decided, but it implies that another helpless client has suffered at the hands of a lawyer. The legal ethics committee should monitor the case closely. Unfortunately, the committee usually won't act unless an official complaint is filed in proper legal form—and then the committee focuses on tedious technicalities rather than basic morality, right and wrong.

As for Judge Tsapis, nothing she might do would be surprising. She once hosted a party at which crooked lawyers under prison sentence or indictment were hailed as heroes. The Judicial Inquiry Commission found nothing wrong with her conduct then. Still, the commission should ask why she allowed a lawyer to take all the public money granted to an impoverished ex-miner too sick to work.

## THE FACTS SURROUNDING THE LIBEL

The 20 May 1983 *Gazette* editorial was written at the insistence of the late W.E. Chilton, III, then the *Gazette*'s publisher and chief executive officer, by James Haught, a senior *Gazette* employee. Mr. Hinerman sued *The Charleston Gazette* on the grounds that the editorial falsely asserted *as fact* that Mr. Hinerman took "every penny" of the Workers' Compensation benefits awarded to a former client, and omitted any reference to such balancing facts as were contained in the *Gazette*'s own news article on the subject (published a few days before the editorial) that would have disclosed that Mr. Levin had received

a permanent total disability award rather than just $12,000, and that Mr. Levin's future benefits were subject to attachment only "until the bill [for fees] was paid." [1]

As part of Mr. Levin's fee arrangement with Mr. Hinerman, it was agreed that Mr. Levin would authorize Mr. Hinerman to receive Mr. Levin's checks so that Mr. Hinerman could deduct his fees as Mr. Levin was paid. Mr. Levin secretly revoked that authorization to avoid paying Mr. Hinerman the standard fee of 20 percent of the first 208 weeks worth of total permanent disability. Mr. Gold's petition on Mr. Levin's behalf in this Court contained a number of statements that represented an extreme of advocacy and, taken *selectively*, failed to convey the facts of the order that was appealed. Taken as a whole, however, the petition accurately related what the circuit court had ordered and, although the petition stated that "[t]he effect of this ruling is to give to the plaintiff, a practicing attorney, all of petitioner's income," it also revealed that the lien against 100 percent of the benefits was to continue *only until the amount already overdue had been recovered.* The petition also made it clear that the judgment granted, and that Mr. Hinerman had sought, only 20 percent of 208 weeks of benefits plus costs.

The *Gazette* editorial not only misstated the facts, but failed even to report those aspects of the petition just related that would have given *some* balance to the editorial. Furthermore, the evidence at trial revealed that the editorial was run *only* at the insistence of the *Gazette*'s publisher, Mr. Chilton, who tightly controlled the paper's editorial policy.[2] Mr. Chilton had run

---

1. "Immigrant appeals lawyer's fee to court," *The Charleston Gazette,* 18 May 1983 (Defendant's Exhibit 19) (herinafter *News Article*).

2. Direct examination of Mr. Haught by Mr. Waddell, attorney for Mr. Hinerman:

Q: Were you the sole author of the editorial?
A: Ned Chilton, the publisher, discussed it with me, but I did the writing.
Q: As I understand it, back in May of 1983 Mr. Chilton, Ned Chilton, was the publisher of the Gazette; am I correct?
A: Correct.
Q: And he was your immediate boss—
A: Right.
Q: —for lack of a better word. And he was a dominating and forceful personality; was he not?
A: Very forceful.
Q: And he dictated the editorial page by the force of his will; did he not?
A: Yes.
Transcript, 1 October 1990, at 106.

numerous editorials critical of lawyers,[3] and Mr. Chilton expressly *required* Mr. Haught to restate allegations the *Gazette* had made in another context concerning a link between Judge Callie Tsapis, the local circuit judge who had entered the order against Mr. Levin, and certain lawyers convicted in federal court of corruption in the Hancock County area.[4]

3. Direct examination of Mr. Haught by Mr. Waddell:

> Q: Would you agree with me that one of the things Mr. Chilton had strong feelings about was lawyers and the legal profession?
> A: Abuses by lawyers.
> Q: He was generally negative with regard to lawyers and the legal profession; was he not?
> A: He was touchy on the topic of corruption among lawyers, and we had just been through the Wally Baron scandals in which ten different lawyers went to prison, and he was very concerned about legal ethics, and had me write a series on legal ethics at one point.
>
> Transcript, 1 October 1990, at 107.

4. Direct examination of Mr. Haught by Mr. Waddell:

> Q: Why is this last paragraph in the editorial about Judge Tsapis?
> A: Because Ned had a special concern about her.
> Q: Special dislike for her?
> A: He was very upset that a judge hadn't been discharged for her involvement with the Altomare group and having a party, hosting for—actually it wasn't the party. It was for. Altomare because he was a guest there and hailed and celebrated at that party, and he felt that was a wrongful position for a judge to be in.
> Q: I see. Why put it in this editorial about Ray Hinerman's problems with Sam Levin?
> A: Because she's the one who took Sam Levin's checks and gave them to Hinerman.
> Q: Were you trying to suggest that she was doing a favor for Mr. Hinerman?
> A: No.
> Q: What were you trying to suggest by that?
> A: Just that her actions were not necessarily always correct.
> Q: What crooked lawyers do [sic] you have in mind when you wrote the editorial?
> A: Altomare and the others who were convicted in that scandal.
> Q: You weren't contending that Mr. Hinerman's a crooked lawyer, were you?
> A: No.
> Q: Would you agree with me that the average reader of this editorial reading that last paragraph would be under the impression

The evidence conclusively reveals, however, that Mr. Haught was aware that Mr. Hinerman had testified against the lawyer who led the group of corrupt lawyers in Hancock County, and that Mr. Hinerman had no connection *whatsoever* to any lawyer-related corruption in Hancock County.[5] Further, Mr. Haught was aware that Mr. Hinerman had not been at the party where the crooked lawyers were allegedly

> that Ray Hinerman was somehow a crooked lawyer receiving a favor from Judge Tsapis?
> A: That was not our intention at all, and I don't think that anybody would read it that way. At least I didn't mean it that way.
> Q: You didn't personally write that last paragraph; did you?
> A: I wrote it all, but Ned had personally made that point.
> Q: Well, Ned instructed you to put that particular paragraph in; did he not?
> A: Yeah. He didn't dictate the whole paragraph, he said, don't forget when she held that party in which everybody was cheering and applauding Altomare.
>
> Transcript, 1 October 1990, at 122–123.

5. Direct examination of Mr. Fred Risovich, II, (*see* note 9) by Mr. Waddell:

> Q: [Mr. Haught] didn't make a statement to that effect that he felt it didn't sound like the Ray Hinerman that he knows or knew?
> A: He did, and that was real significant to me at the time.
> Q: Why was that?
> A: Well, Ray Hinerman is the tupe [sic] of guy that if you're doing something illegal, unethical, he'll call you on it. And we had a prosecuting attorney in Hancock County named Mr. Altomare, and Mr. Altomare got indicted by a Federal Grand Jury. No attorney wanted to go in and tell the truth about Mr. Altomare, and his reputation for truth. Mr. Hinerman went into Federal Court with the FBI and the United States Attorney and testified to the truth. Thereafter, the Charleston Gazette said—and I followed it closely at the time, little bits of information that Haught had written. Some of these articles and this information was coming from an attorney in Hancock County, and in the Bar—we have a small Bar Association. We all speculated it was Hinerman or Fahey, because Fahey had worked in Charleston and Hinerman knew a lot of people in the State. He was a past president of the Bar Association. And, so, when Haught said; I don't think that that's—it doesn't sound like the Ray Hinerman I know, it just—like a light went on. It's Ray who's been telling him. I know how honest Ray is, and they'll clear it up and it didn't happen. They never cleared it up.

"hailed" as heroes by Judge Tsapis.[6] The editorial nevertheless discusses the supposed link between Judge Tsapis and crooked lawyers (implying, of course, a further link through Judge Tsapis between Mr. Hinerman and the crooked lawyers), and concludes by stating that the Judicial Inquiry Commission should "ask why [Judge Tsapis] allowed a lawyer to take all the public money granted to an impoverished ex-miner."

Mr. Haught sent a reporter to double-check the allegations against Mr. Hinerman contained in Mr. Levin's petition in this Court.[7] Yet despite that "double-checking," Mr. Haught's editorial reported none of the facts apparent in the court file that would suggest that the innuendos concerning fraudulent, unethical and reprehensible conduct in the editorial inaccurate. Further, the editorial omitted a fact that had

Transcript, 1 October 1990, at 235–236.

6. Direct examination of Mr. Haught by Mr. Waddell:

Q: Were you aware, were you not, that when you wrote the editorial that Mr. Hinerman wasn't even at the party held by Judge Tsapis; weren't you?
A: Oh, sure but nothing that's in there implies that.
Transcript, 1 October 1990, at 123.

7. Direct examination of Mr. Fahey (see note 9) by Mr. Waddell, describing the conversation between Mr. Fahey and Mr. Haught on May 26, 1983:

Q: During that conversation, did [Mr. Haught] indicate to you any doubt, that he had had any doubt concerning the truth of the allegations that were contained in this editorial prior to it being published?
A: Yes. He had, again, told me that he knew of Ray Hinerman, knew that he wouldn't be involved in that. It must be a different Ray Hinerman. That as soon as he saw the story of what was alleged to have been filed in the Supreme Court, because Ray Hinerman's name was mentioned, he sent the reporter back to doublecheck his source and his information and tried to take those precautions but did not intend to contact Mr. Hinerman or our office to see if there was any other position. [Emphasis added]
Transcript, 2 October 1990, at 29–30.

8. "Hinerman sued Levin for the fees last August and, after Levin neglected to answer the suit, received permission from Ohio County Circuit Judge Callie Tsapis to take 100 percent of Levin's monthly Worker's Compensation benefits

appeared in the Gazette's own story, namely that the 100 percent levy of benefits was to continue "only until the [fee] bill was paid." [8]

Immediately after publication of the editorial, both Mr. Chilton and Mr. Haught received outraged calls from associates and acquaintances of Mr. Hinerman pointing out the inaccuracies in the Gazette editorial.[9] In his conversation with these people, Mr. Haught expressed surprise at the charges made against Mr. Hinerman and, at first, Mr. Haught was apologetic in tone.[10] In various conversations with associates of Mr. Hinerman, particularly William Fahey, Esq., Mr. Haught stated that the charges against Mr. Hinerman surprised him,[11] and he wondered whether those charges could relate to the same Ray Hinerman he knew, because that Ray Hinerman "wouldn't be involved" in something

until his fees are paid." [Emphasis added] News Article, supra note 1.

9. On 20 May 1983, the day the editorial was published, several members of Mr. Hinerman's law firm contacted the Gazette. William T. Fahey, Esq., one such lawyer, arranged for speaker-phone conversations with W.E. Chilton, III (publisher of the Gazette), as well as Mr. Haught. Michael Nogay, Esq., and Fred Risovich, II, Esq., as well as other members of the firm joined Mr. Fahey for at least part of the conversations.

10. Mr. Nogay, reading from a memorandum he prepared at the time right after the article was published:

Mike Nogay phoned [Jim Haught] and put him on the speaker with Bill Fahey present. Mr. Haught told Mike Nogay that 'I knew Ray Hinerman would not do something like this. In fact, I thought this was a different Ray Hinerman than the one in Weirton.' He was also very apologetic and said that the Gazette would print a retraction editorial on Monday.
Transcript, 1 October 1990, at 194.

11. Direct Examination of Mr. Haught by Mr. Waddell:

Q: Do you remember making a statement [to Mr. Fahey], that didn't sound like the Ray Hinerman that you know, or you thought it was another Ray Hinerman, something of that nature?
A: Well, I never thought it was a different Ray Hinerman.
Q: You thought you knew who you were writing about then; correct?
A: Yes, and I was surprised to see that about him.

like that.[12] Mr. Haught repeated similar statements to another Hinerman associate, Michael Nogay, Esq., to whom Mr. Haught also conceded that the paper "might have goofed." [13] However, Mr. Haught never admitted to these callers that he, in fact, was the author of the offending editorial.

Mr. Haught admitted at trial that he considered Mr. Hinerman trustworthy.[14] Mr. Haught also conceded that he expressly promised to print a retraction of the editorial.[15] Mr. Haught first requested that Mr. Hinerman write a letter to the editor, but was told that doing so was prohibited by this Court's ethical rules governing lawyer-client relations.[16] Mr. Haught was, however, informed that a reply to the petition would be submitted to the Supreme Court on an expedited basis, and that Mr. Haught could examine that reply to ascertain Mr. Hinerman's position for purposes of a retraction. The expedited reply was filed on the Monday after the publication of the *Gazette*'s editorial.

The *Gazette* never printed a retraction. Two weeks after the publication of the initial defamatory editorial, the *Gazette* published a second editorial on the matter, entitled "Another Look." The full text of the second editorial is as follows:

### ANOTHER LOOK

Last month, when a petition to the state Supreme Court said a lawyer seized "100 percent" of the Workers' Compen-

---

Transcript, 1 October 1990, at 122–123.

12. Cross-examination of Mr. Fahey by Mr. DiTrapano, attorney for the *Gazette:*
 Q: Well, what is your best recollection as to what Mr. Haught told you about his relationship with Mr. Hinerman?
 A: I know Ray Hinerman, and the Ray Hinerman I know would not be involved in something like that, and that's why I sent the reporter back to double-check the record.
 Transcript, 2 October 1990, at 97.

13. Mr. Nogay reading the memo of conversation he had with Mr. Haught on 20 May 1983:
 I told Mr. Haught that due to ethical considerations he would have to refer to the reply that we would file in the Supreme Court on Monday for our version of the facts. Bill Fahey spoke with Mr. Haught and told him the same thing. Haught again sounded very apologetic over the speaker and it is my recollection that he said 'We might have goofed here.'
 Transcript, 1 October 1990, at 194–195.

14. Direct Examination of Mr. Haught by Mr. Waddell:
 Q: Mr. Haught, did you form an opinion as to Mr. Hinerman's reputation during the course of these conversations [during Mr. Haught's investigation of the Altomare scandal] with him?
 A: Well, I trusted him to be telling me the truth about the other side.
 Q: Did you consider him to be an honorable and straight forward [sic] individual at that time?
 A: As far as I knew.
 Q: You had no information to suggest otherwise; did you?
 A: No.
 Transcript, 1 October 1990, at 104–105.

15. Cross-examination of Mr. Haught by Mr. DiTrapano:
 Q: No. 1, you mentioned that you did have conversations with the lawyers who had called you and making inquiries about the story; is that correct?
 A: I can remember at least one phone call from Bill Fahey. And he surprised me by immediately starting out that everything was wrong and that it was all false, all of the allegations in the Supreme Court case had been a distortion, and they were not true. And that confounded me some. I thought, uh-oh, good grief. If something's wrong, we'll correct it, and we'll get it straight, and we'll get it right, and we'll start going back and taking another look at that.
 Transcript, 1 October 1990, at 165–166.

16. Direct examination of Mr. Fahey by Mr. Waddell:
 Q: When was your next conversation?
 A: I believe it was the afternoon of the 20th. Mr. Haught indicated in the initial conversation that we may want to consider writing a letter to the editor and set forth our position with respect to the inaccuracies contained in the reports and in the editorial. We were of the opinion that that caused some ethical concern, because lawyers aren't supposed to try their cases in the newspapers. We phoned the West Virginia State Bar Ethics Council [sic] who, at that time, I believe was Bob Davis, and he reinforced our interpretation of the ethics of the situation, that we should not reduce ourselves to writing those type of letters, but that we should seek to file a response to the petition in the Supreme Court, and then any newspaper that wanted to cover the countervailing position would have the opportunity to go to official records to learn of our opposition.
 Transcript, 2 October 1990, at 27.

sation benefits of a "destitute" Russian immigrant coal miner, this newspaper urged the State Bar ethics committee to keep an eye on the case.

Later, however, the lawyer filed a special rebuttal saying the "alleged pauper" ex-miner pocketed more than $30,000 benefits, stood to gain perhaps $400,000 from the state fund, and employed a "deceitful plan" to avoid paying the lawyer's $12,088 of the bonanza.

Thus the case of Sam Levin, the immigrant who suffered a heart attack seven months after moving to Wheeling, and Weirton lawyer Ray Hinerman, who got a court order to seize Levin's Workers' Compensation checks, has become a tangle of contradictions. The Supreme Court file contains this crossfire:

The petition said Levin is penniless, living on charity, and that Hinerman took 100 percent of his compensation. The lawyer's reply said Levin got $12,640 temporary total disability benefits, $20,895 lump-sum benefits and $1,162 a month for the rest of his life—a potential $350,000 to $400,000, of which the attorney's share constitutes only 3 percent. The reply attacked "the deliberate distortion that the effect of the ruling by the circuit court gave Raymond A. Hinerman 100 percent of Sam Levin's Workers' Compensation benefits."

The petition said Levin barely understands English, is ignorant of law, and didn't realize he was signing papers to allow Hinerman a huge fee. The lawyer's reply said the Russian is a college-educated engineer who schemed to "bamboozle" Hinerman.

The petition said Hinerman, as UMW lawyer, was paid by the union to handle Levin's claim; that 20 percent disability was granted, which Hinerman appealed, and "a one-day appearance was all that remained" to finish the case. Hinerman left the UMW and Levin retained him privately. The petition says it was unconscionable for the lawyer to take $12,088, the highest allowable share, "for a one-day court appearance" when the UMW had paid him to handle most of the case. But Workers' Compensation records say different UMW lawyers handled the case, and Hinerman said he "diligently pursued the appeal."

The outcome of this sorry affair probably won't be known for months. Meanwhile, it seems that heart attacks have become commercial commodities to be exploited for maximum profit. If a sufferer's attorney can attribute the attack to job strain, rather than life's other strains, both patient and lawyer are enriched.

What's the difference between one heart attack and another? Up to $400,000, this case demonstrates.

We granted the defendant the *Charleston Gazette*'s appeal to determine whether the judgment below for $75,000 in actual damages and $300,000 in punitive damages contravenes First Amendment, freedom of the press principles as articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. We find that the judgment does not.

## I.

The Court below ruled that Mr. Hinerman was a public official at the time he was libeled, based upon the fact that Mr. Hinerman was an appointed municipal judge, a member of the State Racing Commission, and a member of the Board of Governors of the West Virginia State Bar (and subsequently vice president of the State Bar). Although we disagree with the lower court's ruling that Mr. Hinerman was a public official, (*see, infra,* at VI) we will assume for the purposes of reviewing the lower court's judgment that Mr. Hinerman was a public official. Thus, even under the stringent standards applicable to a public official, Mr. Hinerman is still entitled to recover.

█ In order for a public official or a candidate for public office to recover in a libel action, he must prove by clear and convincing evidence that: (1) there was the publication of a defamatory statement of fact or a statement in the form of an opinion that implied the allegation of undis-

closed defamatory facts as the basis for the opinion; (2) the stated or implied facts were false; and, (3) the person who uttered the defamatory statement either knew the statement was false or knew that he was publishing the statement in reckless disregard of whether the statement was false. *See, Restatement (Second) of Torts,* §§ 565, 566 (1977); *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Masson v. New Yorker Magazine, Inc.,* 501 U.S. ——, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

The greatest obstacle that a public official libel plaintiff must overcome is the First Amendment requirement that the publisher of a libel against a public official have a *subjective appreciation* at the time of publication that either (1) the defamatory statement is false or (2) the defamatory statement is being published in reckless disregard of whether it is false. This strict requirement is then reinforced by the *New York Times v. Sullivan* requirement that trial and appellate courts make independent reviews of the facts, although the standard of review has become less stringent than *New York Times* at first appeared to require. *See, infra* Part II.

A reading of U.S. Supreme Court libel cases in the last eight years demonstrates that there have been subtle but important shifts in our libel law that reflect an ebbing tolerance for irresponsible media behavior. Among these changes, perhaps the most important is the U.S. Supreme Court's waning enthusiasm for reviewing libel judgments against media defendants.[17] Other

---

**17.** Although the public official defamation opinions of the U.S. Supreme Court usually begin by citing the *New York Times v. Sullivan* standard of "actual malice" (*see Masson v. New Yorker Magazine, supra; Harte–Hanks, supra; Hustler Magazine v. Falwell,* 485 U.S. 46, 49, 108 S.Ct. 876, 878, 99 L.Ed.2d 41 (1988)), there are indications that these approvals of *New York Times v. Sullivan* are mere genuflections as each year the Court moves farther away from the broad holdings of *New York Times v. Sullivan* and *Gertz v. Robert Welsh, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In the recent decisions of *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (a private figure plaintiff cannot recover without the statements in question being proven false), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (vacating a D.C. Circuit reversal of a grant of a summary judgment on the grounds that the Court of Appeals applied an incorrect standard for reviewing summary judgment), and *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (credit reports are not a matter of public concern, thus eliminating the need for applying *New York Times v. Sullivan* standard), the U.S. Supreme Court used painstaking care to articulate as narrow a holding as possible. Even after the recent changes in Justices, the narrowly drawn holdings have continued in *Masson* and *Harte–Hanks.*

In addition to the narrow holdings, the Court has denied *certiorari* in several cases that presented important defamation issues. *See Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) (presenting a question of opinion versus fact); *DiSalle v. P.G. Publishing Co.,* 375 Pa.Super. 510, 544 A.2d 1345 (1988), *app. denied,* 521 Pa. 620, 557 A.2d 724 (1989), *cert.*

*denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989) (presenting a question on neutral reporting and upholding a jury verdict of $210,-000 in compensatory damages and $2,000,000 in punitive damages); *Brown & Williamson Tobacco Corp. v. CBS, Inc.,* 827 F.2d 1119 (7th Cir. 1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988) (presenting a question of damage limits and upholding $2,000,000 in punitive damages against CBS, $1,000,000 in presumed damages against CBS and $50,000 against the reporter).

Since *Harte–Hanks,* the only case on defamation decided by the U.S. Supreme Court is *Masson v. New Yorker Magazine,* even though numerous petitions for *certiorari* were submitted. *See Locricchio v. Evening News Association,* 438 Mich. 84, 476 N.W.2d 112 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Newton v. National Broadcasting Co.,* 930 F.2d 662 (9th Cir., 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991); *Ward v. Roy H. Park Broadcasting Co.,* 328 N.C. 577, 403 S.E.2d 522 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); *McCoy v. Hearst Corp.,* 227 Cal. App.3d 1657, 278 Cal.Rptr. 596 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Mosesian v. McClatchy Newspapers, Inc.,* 233 Cal.App.3d 1685, 285 Cal.Rptr. 430 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992); *Worldwide Church of God v. McNair, cert. denied,* —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991); *Spence v. Flynt,* 816 P.2d 771 (Wyo., 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 388 (1992); *Birsner v. Sivalignham, cert. denied,* —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992); *Celebrezze v. Netzley,* 51 Ohio St.3d 89, 554 N.E.2d 1292 (1990), *reh'g denied,* 52 Ohio St.3d 710, 557 N.E.2d 1217 (1990), and

important changes include the express endorsement of a "clearly erroneous" standard for reviewing jury findings of fact, and recognition that egregious deviation from accepted journalistic standards and ill will toward the victim are admissible circumstantial evidence of actual malice.[18]

■■■ Although egregious deviation from accepted standards of journalism *standing alone* will not carry the day for a public official libel plaintiff, egregious deviation is one important piece of circumstantial evidence which, when combined with other evidence, can lead a jury properly to find that subjective appreciation of falsity or recklessness existed at the time of publication. Similarly, although partisanship,

animus toward the subject of a libel, or other "malicious" motives are not, alone, conclusive evidence of "actual malice" as that term is defined in *New York Times v. Sullivan, supra,* and subsequent cases, partisanship, ill will towards the subject of a libel, and other "malicious" motives may be considered by the jury in their determination of whether a subjective realization that the statement was false or a subjective realization that the statement was being published recklessly, existed at the time the statement was published.

In light of the subtle but important changes occurring in the national law of libel,[19] we shall attempt today to clarify

*cert. denied* 498 U.S. 967, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990); *Reuber v. Food Chemical News,* 925 F.2d 703 (4th Cir.1991), *cert. denied,* — U.S. —, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Diesen v. Hessburg,* 455 N.W.2d 446 (1990), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *Dale v. Ohio Civil Service Employees Ass'n,* 57 Ohio St.3d 112, 567 N.E.2d 253 (1991), *cert. denied sub nom, Dale v. American Federation of State, County and Mun. Employees, Intern., AFL–CIO,* — U.S. —, 111 S.Ct. 2853, 115 L.Ed.2d 1021 (1991); *Fletcher v. San Jose Mercury News,* 216 Cal. App.3d 172, 264 Cal.Rptr. 699 (1990), *cert. denied,* 498 U.S. 813, 111 S.Ct. 51, 112 L.Ed.2d 26 (1990); *Ball v. E.W. Scripps Co.,* 801 S.W.2d 684 (Ky., 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991); *Barber v. Perdue,* 194 Ga.App. 287, 390 S.E.2d 234 (1989), *cert. denied,* 498 U.S. 967, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990); *Unelko Corp. v. Rooney,* 912 F.2d 1049 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991); *Smith v. McDonald,* 895 F.2d 147 (4th Cir.1990), *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 29 (1990); *Villarreal v. Harte–Hanks Communications, Inc.,* 787 S.W.2d 131 (Tex.App., 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1316, 113 L.Ed.2d 249 (1991); *Warford v. Lexington Herald–Leader Co.,* 789 S.W.2d 758 (Ky., 1990), *cert. denied, Lexington Herald–Leader Co. v. Warford,* 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991); *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991), *cert. denied,* — U.S. —, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991).

**18.** In *Harte–Hanks, supra,* Justice Stevens, a liberal writing for the majority, said:
 Certain statements in the Court of Appeals' opinion, when read in isolation, appear to indicate that the court at times substituted the professional standards rule for the actual malice requirement and at other times inferred actual malice from the newspaper's motive in publishing Thompson's story. Nevertheless,

when the opinion is read as a whole, *it is clear that the conclusion concerning the newspaper's departure from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of "actual malice" as found by the jury.* 842 F2d [825], at 847 [ (6th Cir.1988) ]. *Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence,* see *Herbert v. Lando,* 441 US 153, 160, 60 LEd2d 115, 99 SCt 1635 [1640], (1979); ι *Tavoulareas v. Piro,* 260 US-AppDC 39, 66, 817 F2d 762, 789 (en banc), cert denied, 484 US 870, 98 LEd2d 151, 108 SCt 200 (1987), *and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.* Thus, we are satisfied that the Court of Appeals judged the case by the correct substantive standard. [Emphasis added]
491 U.S., at 667–668, 109 S.Ct. at 2686.

**19.** Indeed, the U.S. Supreme Court appears to be weary of the defamation issue. During the oral argument in *Anderson v. Liberty Lobby, Inc., supra* note 17, after questioning the plaintiff's lawyer on the libel suit's chilling effect on the media, Chief Justice Rehnquist (then Justice Rehnquist) remarked that after reading the record in the case "one might truthfully say a chill on both your houses." *News Notes,* 12 Media L.Rep. (BNA) 1344 (Dec. 10, 1985).

A mere two years after dissenting in *Anderson,* Chief Justice Rehnquist, writing for the majority, affirmed "our considered judgment that such a *[New York Times v. Sullivan ]* standard is necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Hustler, supra* note 17, 485 U.S. at 56, 108 S.Ct. at 882. In *Hustler,* Chief Justice

both the media's privileges and the media's obligations as we see them in the State of West Virginia. First, however, it is necessary to explain why libel law is slowly shifting to become more solicitous of the rights of injured victims. Only by understanding the reasons for the pro-victim shift can the bar help their media clients to conform to the law with negligible self-censorship side effects.

The reason for the law's new concern for victims is probably best explained by S. Robert Lichter, Stanley Rothman and Linda S. Lichter, in their study *The Media Elite:* [20]

In the early 1970's, even as America's Vietnam involvement wound down, a third front appeared in the now ongoing media-government conflict. Watergate became the next major long-running story in a decade to pit the national media against political authority. This time the *Washington Post* took the lead, though *The New York Times* and television also played major roles. In fact, the public image of a more adversarial media probably owes less to Bob Woodward and Carl Bernstein's investigations than to the celebrated confrontation between President Nixon and CBS White House correspondent Dan Rather.

In the years that followed Watergate, the national media rode a wave of popularity and perceived power. They appeared to have chosen the "right" side of the critical conflicts of a turbulent decade. Moreover, they had consistently picked the winning side. They prevailed in conflicts with such seemingly entrenched forces as southern segregationists, Vietnam hawks, and two once-popular presidents. They were courted by politicians and revered on college campuses. Investigative journalism inherited the cachet young activists had earlier conferred on the Peace Corps and Nader's Raiders. Bright and idealistic young people flocked to the profession, lured by the prospect of exercising both personal creativity and social influence, not to mention the chance for fame and fortune.

Inevitably, this wave of popularity crested and broke. By the early 1980's, public confidence in the press had dropped sharply from its Watergate high point. Public criticism of media negativism and lack of fairness also began to emerge. A series of scandals and libel suits also seemed to cast doubt on the credibility of several major media outlets. At one point three of the most important and prestigious news organizations simultaneously faced embarrassing and financially threatening lawsuits—CBS from General William Westmoreland, *Time* from Israeli Defense Minister Ariel Sharon, and the *Washington Post* from Mobil Oil's Chief Executive Officer.

Public disenchantment with the media may simply reflect changes in the social agenda. After Watergate, the great issues of the day offered less opportunity for the media to play the role of public tribune. Issues like inflation and energy could neither be explained nor solved by public morality plays. Television played a major role in the Iranian hostage crisis, but the cameras proved impotent in resolving the events they conveyed. Thus, in the 1980's, an upsurge of national pride, almost in reaction against a decade of bad news, seemed to catch the media by surprise. For the first time in two decades, the critical and reformist strain

---

Rehnquist quoted from two opinions to which he had previously dissented: *Bose Corp v. Consumers Union, Inc.,* 466 U.S. 485, 515, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984) (Rehnquist, J., dissenting); and *Philadelphia Newspapers, Inc. v. Hepps, supra* note 17 (Stevens, J., dissenting, joined by Justice Rehnquist). *Hustler,* 485 U.S. at 51–52, 108 S.Ct. at 880. Chief Justice Rehnquist concurred in *Harte–Hanks* (1989) and *Masson v. New Yorker Magazine, supra* (1991). This shift by Chief Justice Rehnquist may signal that the majority position has moved sufficiently to accommodate the concerns of at least one of the dissenters.

**20.** Adler and Adler (Bethesda, Md., 1986). This study was sponsored by the Center for the Study of Social and Political Change at Smith College, the Center for Media and Public Affairs, the Research Institute on International Change at Columbia University, and George Washington University.

of national journalism seemed to go against the grain of a changing Zeitgeist. *The Media Elite, supra* note 20, at 15–16.

Although the above passage is an excellent analysis of what is going on at the most abstract, philosophical level, there are also more sinister, self-serving forces at work in both the print and broadcast media that evoke a widespread demand among the public for greater media accountability. Thus, there is a rediscovery that the popular media are in the *entertainment* business far more than they are in the information business.[21] Although in the age of "yellow journalism" when William Randolph Hearst actually started wars[22] to create entertaining (and therefore profitable) headlines, the American public understood that sensationalism is the *sine qua non* of successful publishing (and now news broadcasting), the euphoria surrounding the press' advocacy of civil rights, disengagement from Vietnam, and honest government in the Watergate era obscured temporarily this previously well-known fact.[23]

Unfortunately, a large measure of the economic success of any newspaper or broadcast news department is dependent upon sensational or "entertaining" scandal.[24] As Tennyson points out in *Idylls of the King,* "Merlin and Vivian," [25] mankind has an inveterate predilection to rejoice in the suffering and degradation of others:

> ... Tho' harlots paint their talk as well as face With colors of the heart that are not theirs. I will not let her know; nine tithes of times Face-flatterer and backbiter are the same, And they, sweet soul, that most impute a crime Are pronest to it, and impute themselves, Wanting the mental range, or low desire Not to feel lowest makes them level all; Yea, they would pare the mountain to the plain, To leave an equal baseness; and in this Are harlots like the crowd that if they find Some stain or blemish in a name of note, Not grieving that their greatest are so small, Inflate themselves with some insane delight, And judge all nature from her feet of clay, Without the will to lift their eyes, and see Her godlike head crown'd with spiritual fire, And touching other worlds. [Bold type added]

There is, nonetheless, no vehicle other than the commercial media for the transmission of information. A tightening of the libel laws, therefore, inevitably implies higher levels of self-censorship, which jeopardizes full, robust, and untrammeled polit-

---

**21.** *See,* Niel Postman, *Amusing Ourselves to Death: Public Discourse in the Age of Show Business,* Viking Penguin (New York, 1985).

**22.** During the "ferment" before the Spanish–American War, Mr. Hearst's reporter in Cuba, noted artist Frederick Remington, telegraphed Mr. Hearst: "EVERYTHING IS QUIET. THERE IS NO TROUBLE HERE. THERE WILL BE NO WAR. I WISH TO RETURN." Mr. Hearst immediately wired back: "PLEASE REMAIN. YOU FURNISH THE PICTURES AND I'LL FURNISH THE WAR." Ferdinand Lundberg, *Imperial Hearst, A Social Biography,* Greenwood Press (Westport, Conn., 1970), at 68–69.

**23.** The excesses of "yellow journalism" prompted Charles Warren and Louis Brandeis to write their famous *Harvard Law Review* article on the right to privacy. Warren and Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890).

**24.** Of course, one can entertain to a fare-thee-well with the truth, and with regard to a public official, one can even entertain negligently. However, the courts now seem serious about refusing to allow entertainment, even at the expense of a public official, through the use of known, straight-up, boldfaced lies. *See, e.g., Burnett v. National Enquirer, Inc.,* 144 Cal. App.3d 991, 193 Cal.Rptr. 206 (1983), *appeal dismissed,* 465 U.S. 1014, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984). The Enquirer wrote:

> In a Washington restaurant, a boisterous Carol Burnett had a loud argument with another diner, Henry Kissinger. Then she traipsed around the place offering everyone a bite of dessert. But Carol really raised eyebrows when she accidentally knocked over a glass of wine and started giggling instead of apologizing. The guy wasn't amused and "accidently" spilled a glass of wine over Carol's dress.

Despite the fact that the *Enquirer* printed a retraction of the story (admitting it was false), the jury awarded $300,000 compensatory damages and $1,300,000 in punitive damages. The award was ultimately reduced to $50,000 compensatory damages and $150,000 in punitive damages.

**25.** New American Library Edition, p. 135.

ical debate. It is for that reason, then, that trial and appellate courts, notwithstanding the pronounced pro-victim shift, are still more solicitous of the media than of any other class of business defendants in our tort system, and why courts continue to protect the media whenever a plaintiff has not proven his case by clear and convincing evidence. *See, Dixon v. Ogden,* 187 W.Va. 120, 416 S.E.2d 237 (1992).

In libel cases involving public officials or candidates for public office, there is no objective, reasonable person standard that holds everyone alike to a uniform level of due diligence or reasonable care. A ninth-grade school newspaper cannot be held to the same standard as *The Charleston Gazette,* and *The Charleston Gazette* cannot be held to the same standard as *The New York Times.* When, however, the evidence clearly demonstrates subjective appreciation of either falsity or recklessness, it is appropriate for courts to require accountability.[26]

## II.

Under *New York Times v. Sullivan, supra,* it is the obligation of a reviewing court to make an independent evaluation of the facts to determine whether the jury's verdict was correct and liability can properly be imposed upon a media defendant. The standard of independent review is appropriately set out in *Harte-Hanks,* as follows:

"In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses." *Bose,* 466 US, at 499–500, 80 LEd2d 502, 104 SCt 1949, [at 1958–59] the reviewing court must " 'examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect,' " *New York Times Co.* 376 US, at 285, 11 LEd2d 686, 84 SCt 710 [at 728], 95 ALR2d 1412 (quoting *Pennekamp v Florida,* 328 US 331, 335, 90 LEd 1295, 66 SCt 1029 [1031] (1946)).

*Harte–Hanks, supra,* 491 U.S. at 688–689, 109 S.Ct. at 2696.

We have independently reviewed the factual record and conclude that the jury was correct in determining that there was clear and convincing evidence that the writer of the editorial, Mr. Haught, at the time the editorial was written, either knew that the impression of dishonesty and unethical conduct that the editorial intentionally conveyed was false, or that Mr. Haught published the editorial with a subjective appreciation that, *at least,* he was recklessly disregarding the truth. Although there is direct evidence on subjective appreciation from Mr. Haught and those who talked with Mr. Haught soon after the libelous editorial was written, there is also strong circumstantial evidence emerging from

---

**26.** Certainly, in seeking greater media accountability courts are not holding the media to any higher standard than we hold ourselves. Indeed, both the media and the courts have a difficult time coping with principles of "accountability" because of possible "chilling effects." Like the media, the courts have a favored status, (i.e., judicial immunity) for mistakes—even serious mistakes. *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.' *Bradley* [*v. Fisher,* 80 U.S.], 13 Wall. [335,] 351 [20 L.Ed. 646 (1872) ]"). However, the U.S. Supreme Court has placed some

limits even on the courts, which are not allowed total immunity when a judge's conduct is both willful and outrageous. *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (No judicial immunity bar to prospective injunctive relief under 42 U.S.C. § 1983; attorneys' fees may be awarded to plaintiff suing a judge and winning under § 1983 due to the Civil Rights Attorney's Fees Awards Act of 1976).

Unlike the media, the courts have strict and enforceable canons of ethics, and a litigant aggrieved by the abusive conduct of a judge is provided a forum where serious sanctions may be imposed upon the judge. *See West Virginia Judicial Code of Ethics* [1973, as amended]; *W.Va. Const.,* art. VIII, § 8. This system may not be perfect, but it is better than anything the media have.

gross deviations from generally accepted standards of journalism. For example, before the editorial was published, no effort was made to contact Mr. Hinerman to determine whether he had anything to say for himself that might make him look less reprehensible or might refute the facts alleged in the editorial.

In addition to egregious deviation from generally accepted standards of journalism, the record is also replete with evidence that the *Gazette*'s publisher, Mr. Chilton, bore strong animus towards lawyers in general and that he regularly wrote editorials highly critical of lawyers and the legal profession. Moreover, the evidence is overwhelming that Mr. Haught had serious misgivings about the appropriateness of the editorial,[27] and the jury was more than entitled to infer from Mr. Haught's own testimony that the editorial would not have been composed or published but for the explicit direction of the *Gazette*'s publisher, and that Mr. Haught conveyed his misgivings to his publisher at the time the editorial was written.

■ The petition filed on behalf of Mr. Levin in this Court contained the following paragraph:

> On November 16, 1982, the Court granted plaintiff's Motion that 100 percent of petitioner's Workmen's Compensation benefits be paid directly to plaintiff until the amount of 20 percent of benefits already awarded, plus costs, had been taken by plaintiff. Only after plaintiff had been paid these sums will petitioner receive any of his award. **The effect of the ruling is to give the plaintiff, a practicing attorney, all of petitioner's income while the petitioner, who is totally disabled, has no source of income whatsoever.**

Nonetheless, only the part that we have set forth in bold in the quote above was reproduced as an allegation in the defendant's editorial. As we said in Syllabus Point 5 of *Dixon v. Ogden, supra* in text:

> Evidence that a media defendant intentionally "avoided" the truth in its investi-

gatory techniques or omitted facts in order to distort the truth may support a finding of actual malice necessary to sustain an action for libel.

An earlier *Gazette* news story faithfully incorporated the distinction between 20 percent of benefits already awarded and *all* of Mr. Levin's Workers' Compensation award. Indeed, although under the requirement for subjective appreciation, one employee's knowledge that a story is false cannot be imputed to the employee writing the story under agency principles, the fact that in this case the truth was both generally known and generally available is further circumstantial evidence of "actual malice."

### III.

■ The *Gazette*'s most important argument on appeal is that even though its editorial was both false and defamatory, the *Gazette* enjoyed two privileges that make the paper immune from liability. The first privilege the *Gazette* asserts is the privilege of "fair comment," which protects editorial opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Indeed, this Court has expressly recognized the privilege of "fair comment," and has accorded the media wide latitude for editorial opinion, *Havalunch v. Mazza*, 170 W.Va. 268, 294 S.E.2d 70 (1981). Unless an opinion, no matter how scurrilous, implies undisclosed defamatory facts, we protect it. *Hustler, supra* note 17. Sharp, vituperative and biting criticism are at the heart of free debate. Thus, if the editorial at issue in the case before us were simply a recitation of the defendant's opinion that all lawyers are low-life and Mr. Hinerman, by membership in the legal profession, must on that account be low-life as well, the editorial would be privileged as fair comment.

■ The second privilege the *Gazette* asserts is the privilege to report official proceedings or public meetings. The details of this privilege are best summarized in § 611, *Restatement (Second) of Torts* (1977), which provides as follows:

27. *See supra* notes 10–15.

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Consequently, if the *Gazette* had simply published the allegations against Mr. Hinerman set forth in Mr. Levin's petition, or a *fair* abridgement of those allegations, then that publication, notwithstanding that it would have been damning, would also have been privileged.

██ Although we recognize the privilege of fair comment and the privilege to report official proceedings, we do not accept the *Gazette*'s argument that it may shuffle the two privileges to create an editorial that is primarily a recitation of alleged *facts* where the reader is led to believe that the editorial writer *believes* the reported unsubstantiated facts, which are indeed untruths or half-truths. A regular news account that sets forth pleadings—notwithstanding that they are entirely one-sided—gives at least some notice to the reader that unsubstantiated allegations are being reported. Similarly, an article appearing on the editorial page that is derogatory, derisive or generally abusive, without alleging or implying any supporting facts, gives fair warning that the article is simply the editorial writer's opinion. However, when unsubstantiated allegations are so combined with strongly partisan opinion that the reader is led to believe that the editorial writer has access to undisclosed defamatory facts that lead him to believe the allegations he is reporting from a court proceeding are correct, the bounds of permissible behavior are overstepped.

Indeed, this very problem has been addressed by the learned restaters in Comment F to § 611, *Restatement (Second) of Torts* (1977) which says:

Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading.

Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. *The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.* [Emphasis added]

Thus, to parallel the language of Comment F, the plaintiff in this case is entitled to recover because the *Gazette* made additions of its own to what would otherwise be a privileged report of a court proceeding that conveyed a defamatory impression, imputed corrupt motives to the plaintiff, and indicted the integrity of the plaintiff.

██ When damning allegations from a court proceeding are combined with caustic and vituperative editorial opinion, the defamatory impression fairly conveyed enjoys a strength that is some exponential function of the defamatory impression that either unsubstantiated allegations or naked opinion would convey standing alone. This type of conduct enjoys no privilege.

### IV.

██ The *Gazette* asks that even if we sustain the compensatory damages in this case, we strike the punitive damages because such damages exert a chilling effect upon First Amendment rights. However, we see no error in the award of $300,000 in punitive damages under *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) and *TXO Production Corp., v. Alliance Resources, Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992).[28] Cer-

---

**28.** Recently in *Browning–Ferris Industries, Inc.*

*v. Kelco*, 492 U.S. 257, 280, 109 S.Ct. 2909, 2923,

tainly, the punitive damages in this case bear a reasonable relationship to the compensatory damages and are lower than the five to one ratio that we indicated in *TXO, supra,* are presumptively valid in situations where people are simply "really stupid." *TXO,* at 475, 419 S.E.2d at 888. However, in this case far greater punitive damages could be sustained on appeal because the evidence indicates that the defendant moved from the "really stupid" category discussed in *TXO* to the "really mean" category. *TXO,* at 476, 419 S.E.2d at 889.

Because this case was tried on the theory that Mr. Hinerman was a public official, no recovery whatsoever could have been had unless the jury were convinced by clear and convincing evidence that the defendant acted from actual malice—i.e., that the defendant published false and defamatory material either knowing that it was false or with reckless disregard of whether it was false, and with an intent to injure the plaintiff.[29]

No case could be stronger for punitive damages, and in light of the defendant's failure to retract its statement, its failure to offer an apology, and its failure to offer amends in any way for its defamatory statement, we see no just grounds for a remittitur. *Simon v. Shearson Lehman Bros., Inc.,* 895 F.2d 1304 (11th Cir.1990) (holding a $5,000,000 punitive damage award to be excessive and finding the maximum amount of punitive damages in that case to be $1,000,000); *Schiavone Const. Co. v. Time, Inc.,* 847 F.2d 1069 (3rd Cir. 1988) (holding that punitive damages could be awarded if after a retraction was demanded by the plaintiff, no retraction was published).[30]

Nonetheless, for the benefit of future litigants, we would point out that the anxiety we expressed in *Sprouse v. Clay Communications, Inc.,* 158 W.Va. 427, 211 S.E.2d 674, *cert. denied,* 423 U.S. 882, 96

106 L.Ed.2d 219 (1989), the U.S. Supreme Court declined to disturb "the jury's punitive damages award" of $6 million on the grounds that it violated the Excessive Fines Clause of the Eighth Amendment. A year earlier, in *Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), the Court refused to disturb a punitive damage award of $1.6 million based on the insurer's bad-faith refusal to pay on the grounds that it violated the Equal Protection Clause of the Fourteenth Amendment. *See DiSalle v. P.G. Publishing Co., supra* note 17 (upholding a jury verdict of $210,-000 in compensatory damages and $2,000,000 in punitive damages); *Brown & Williamson Tobacco Corp. v. CBS, Inc., supra* note 17 (upholding $2,000,000 in punitive damages against CBS, $1,000,000 in presumed damages against CBS and $50,000 against the reporter).

**29.** *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 170, 87 S.Ct. 1975, 1999, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring) ("Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers."); *Appleyard v. Transamerican Press, Inc.,* 539 F.2d 1026 (4th Cir.1976), *cert. denied* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977) (holding that the prevention of a chilling effect on the First Amendment has little application where actual malice, the *New York Times v. Sullivan* standard, has been shown); *Maheu v. Hughes Toolco,* 569 F.2d 459, 480 (9th Cir.1977), (holding that "punitive damages are permissible once actual malice as defined in *New York Times* has been established").

**30.** Furthermore, assuming that the *Gazette* believed that its statements were privileged and

thus not actionable in a court of law, what conceivable motive other than surpassing ego and unbridled arrogance could have prevented the *Gazette* from making amends through a prompt, prominent and abject apology? In the long run, law and morality are not separate spheres, *See,* H. Berman, *Law and Revolution,* Harvard University Press (Cambridge, MA., 1983), which is why we observe the pro-victim shifts in the libel law that are discussed in part I in the text. Furthermore, appropriate apologies are easy to do. For example, in the 16 January 1992 issue of *The New York Review of Books,* the following apology appeared in a box 4.75 inches by 2.375 inches at the upper right hand corner of p. 15:

MR. RANDOLL COATE: AN APOLOGY
In a review of The Polk Conspiracy by Kati Marton which appeared in our issue of September 26, 1991, the reviewer reported certain allegations concerning Mr. Randoll Coate which we accept are entirely unfounded. We wish to make it abundantly clear that we accept without qualifications Mr. Coate's statement that he was not:
(a) connected in any way with a plot leading to the death of Mr. George Polk in Greece in 1948 or with any attempt to cover it up; and
(b) at any time in possession of information concerning the identity of those responsible.
We greatly regret the distress this has caused Mr. Coate and offer him our sincere apologies.

S.Ct. 145, 46 L.Ed.2d 107 (1975) about the propriety of punitive damages still persists, and in appropriate circumstances we remain willing to craft special rules governing punitive damages against media defendants in deference to First Amendment considerations. However, in the punitive damages area there is a yet unresolved tension among: (1) the public's demand for accountability; (2) the surpassing arrogance of the media; and, (3) the courts' justified concerns that punitive damages will lead to excessive self-censorship. It is this tension that we hope to resolve today.

In *Garnes v. Fleming Landfill, supra,* we discussed the constitutional limits on punitive damages and set forth criteria for reviewing punitive damages awards. Among the factors set forth for determining whether, in a particular case, punitive damages are excessive is the criterion of whether the defendant made a timely offer to compensate the victim once liability became clear. Syllabus Point 3, *Garnes.*[31] Consequently, under this criterion of *Garnes,* the *Gazette* is entitled to no favorable consideration because the *Gazette* never apologized or attempted to make amends *even when it became abundantly clear to all concerned that a serious injustice had been done.*[32] If anything, the follow-up editorial quoted earlier that allegedly gave the matter "another look" actually added insult to injury.

 We accept with enthusiasm the First Amendment obligation of the courts to protect robust and untrammeled discussion, but we fail to see how untrammeled media arrogance in any way furthers the legitimate ends of free speech. First Amendment, free speech considerations compel that we grant substantial privileges to the media, but we are also entitled to impose corresponding obligations when the media's fulfillment of those obligations will not compromise free speech one iota or lead to self-censorship. Obviously, when a media organization libels someone, that media organization exacerbates the harm it has done on every day that it permits the defamatory impression it has conveyed to persist in the mind of the reading or listening public.

 Consequently, the media defendant who makes a prompt, prominent and abject apology calculated to reach as many people with the same or greater intensity as the original libel may reasonably ask to be treated differently for the purposes of punitive damages from the media defendant who persists in allowing the victim's reputation to suffer. Therefore, although a prompt, prominent and abject apology combined with an offer to pay reasonable damages will not shield a media defendant from paying actual damages, such offers to make amends may shield a media defendant from punitive damages under Syllabus Point 3 of *Garnes, supra,* as applied under *New York Times v. Sullivan, supra,* and *Sprouse v. Clay Communications, supra.*[33] However, when no appropriate apol-

---

**31.** One of the proposals for defamation reform would bar litigation if a retraction is published or broadcast before the institution of the suit. *See* The Gannett Center for Media Studies, Conference Report, *The Cost of Libel: Economic and Policy Implications* (1986), at 19. Some states have long taken retraction into account in reducing potential defamation liability. For example, the law in California is:

In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover *no more than special damages* unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said

notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

Cal.Civ.Code § 48a(1) (West 1982).

**32.** A reading of the record in this case, particularly the testimony of friends and associates of Mr. Hinerman who telephoned the *Gazette* to prompt a correction or retraction, leads almost ineluctably to the inference that this entire matter could have been settled for an apology. Nothing in the record before us leads us to believe that Mr. Hinerman welcomed this libel as an opportunity to begin a lawsuit against a well-heeled corporate defendant.

**33.** As is usual in these matters, slightly different rules apply when the actual damages are negligible. *See Hayseeds v. State Farm Fire & Cas.,*

ogy or offer of reasonable compensation has been made, free speech considerations are not implicated when punitive damages similar to those that would be awarded in any other tort matter involving willful injury are awarded in a libel case.

In all American manufacturing, we impose liability for defective products. "Libel" is the peculiar name given to the product liability law that applies to the media. We have *not* given the media favored status over automobile, stepladder and lawn mower manufacturers because *we want arrogant, abusive, and irresponsible media* companies; rather, we have given favored status to the media because we do not want to chill robust and untrammeled debate about public issues.[34]

Today's media organizations are even bigger than they were at the time *New York Times v. Sullivan* was written, and increasingly both local newspapers and local broadcast stations are owned by distant conglomerates. *See, The Media Elite, supra* note 20. At the moment large media corporations give substantial control over editorial content to local management who live and work in the area served, but these management employees are also human beings with passions and flaws. Wide-open liability for punitive damages, therefore, is likely to induce profit-maximizing media conglomerates to impose standard corporate operating procedures requiring local management to be unreasonably conservative. *See* note 34. Papers that produce nothing but AP bear stories, pictures of children eating ice cream cones on the Fourth of July, and food store advertisements are not what the public needs every morning over coffee.

The tenure of the late W.E. Chilton, III, as the *Gazette*'s long-time publisher, demonstrates why tempering punitive damages against a corporate defendant when one or two employees has or have behaved improperly is entirely proper. Mr. Chilton was a corporate employee who owned sub-stantially less than a controlling interest in the defendant corporation. Although Mr. Chilton was a man and not a saint, the broad license that his fellow stockholders accorded him to manage the *Gazette*'s editorial policy inured enormously to the benefit of the people of this State.

The record before us demonstrates that Mr. Chilton's editorial policy of strictly scrutinizing the behavior of lawyers led to one of the towering modern law reforms in this State, namely the abolition of the old "commissioners of account" system under which political appointees received enormous fees for precious little effort in the administration of decedents' estates. Mr. Chilton's premature death was a tragedy that has become progressively more obvious even to Mr. Chilton's detractors as the specter becomes prominent of "The State's Newspaper" being bought by an anonymous national McMedia corporation with little understanding and even less affection for the State, its peculiar traditions, and its people. Although this is a strange context in which to say it, *ave atque vale* W.E. Chilton, III.

■ Consequently, we recognize that society is better served if some latitude for "human error" is accorded both our impecunious mom and pop papers and the great media conglomerates with regard to punitive damages. However, none of these policy considerations persists when punitive damages are sustained against a company that has refused to make a prompt, prominent and abject apology for a known mistake and failed to make a reasonable offer of settlement. Under those circumstances, tempering punitive damages nurtures arrogance and unaccountability rather than full and robust debate. Therefore, failure to extend a prompt, prominent and abject apology along with a prompt offer of reasonable damages when it has become clear that an injustice has been done removes any obstacle to the imposition of *TXO-*

177 W.Va. 323, 352 S.E.2d 73 (1986); *TXO, supra.*

**34.** *See,* Anderson, *Libel and Press Self–Censorship,* 53 Tex.L.Rev. 422, 432 (1975) (noting that the products liability analogy to media is limited because of the media's ability to decrease the risk "by increasing their self-censorship").

type [35] punitive damages once the high burden of proof for public official libel has been met.

Consequently, in libel cases we expressly endorse the "offer of fair settlement" criterion articulated in *Garnes, supra,* and, henceforth, that criterion will be the cynosure in determining the "reasonableness" of punitive damages in libel cases *whenever the media, as in the case before us, requests special treatment not accorded to automobile, stepladder and lawn mower manufacturers because of First Amendment considerations.*

### V.

 The *Gazette* assigns error to some of the court's instructions and objects to the court's failure to give some of the *Gazette's* instructions. We have reviewed these assignments and find them sufficiently without merit not to be fairly raised.[36]

The *Gazette* also assigns error to the trial of this case in Brooke County. The *Gazette* maintains that at trial there was no proof that *The Charleston Gazette* was distributed in Brooke County by the *Gazette* on the day the libelous editorial appeared. Therefore, the *Gazette* argues, the Circuit Court of Brooke County did not have jurisdiction.

 The *Gazette* confuses jurisdiction with venue. The pretrial order in this case, which was agreed to by both plaintiff's and defendant's counsel, provided that both jurisdiction and venue were proper in Brooke County. Although lack of subject matter jurisdiction cannot be waived, lack of proper venue certainly can. "Jurisdiction implies or imports the power of the court, venue the place of the action." *State ex rel. Chemical Tank Lines, Inc., v. Davis,* 141 W.Va. 488, 494, 93 S.E.2d 28, 32 (1956) (quoting *Arganbright v. Good,* 46 Cal. App.2d Supp. 877, 116 P.2d 186). *See also, Sidney C. Smith Corp. v. Dailey,* 136 W.Va. 380, 67 S.E.2d 523 (1951); *W.Va. Const.,* art. VIII, § 6.[37]

### VI.

 Finally, the plaintiff cross-assigns error to the circuit court's determination that by virtue of his position as an appointed municipal judge, his membership on the West Virginia Racing Commission, and his membership on the Board of Governors of West Virginia State Bar, the plaintiff is a "public official." Although resolution of this issue is not necessary for our decision in this appeal, should a retrial become necessary, a resolution of this issue will be important. Consequently, we hold that under applicable First Amendment principles, Mr. Hinerman is not a public official or public figure for the purposes of this defamation action.

 In defamation cases, three types of plaintiffs exist: (1) public officials and candidates for public office; (2) public

---

**35.** In *TXO,* this court sustained a judgment for $19,000 in actual damages and $10,000,000 in punitive damages under circumstances where an enormous national company, proceeding from the most malicious of motives, used consummate cunning combined with elaborate premeditation to attempt to steal thousands of acres of oil and gas belonging to a group of unsophisticated, hardworking country oil and gas producers.

**36.** Typical of these assignments is the following: The circuit court's instructions stated:

> The Court instructs the jury that a communication is defamatory if it tends so to harm the reputation of another or to lower him in the estimation of the community, such as by reflecting upon his personal morality or integrity, or if the communication deters third persons from associating or dealing with him.

The *Gazette* maintains that the circuit court should have included the following sentence in the instruction:

> A statement about a public official such as Mr. Hinerman cannot be considered defamatory unless it would reflect shame, contumely and disgrace upon him or unless it falsely charges him with a crime or personal dishonesty.

We fail to see how the defendant's language differs in purport from the instruction actually given by the circuit court.

**37.** If, indeed, the lower court had ordered that Mr. Haught be hanged by the neck until he was dead, the court would have lacked jurisdiction to impose that penalty, and this court would have looked favorably on an assignment alleging that penalty as error, even if during the trial Mr. Haught had been so contrite as to waive all objection.

figures; and, (3) private individuals. *Gertz, supra* note 17. Public officials are "those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966). Publicly elected officials, of course, are "public officials" for purposes of defamation law. *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986). However, the public official category "cannot be thought to include all public employees." *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 2680 n. 8, 61 L.Ed.2d 411 (1979).

Mr. Hinerman does not qualify as an elected public official by virtue of any of the positions relied upon by the *Gazette.* He was appointed to the municipal judgeship, he was appointed to a position on the racing commission, and he was elected by lawyers, not the public, to the Board of Governors of the West Virginia State Bar. Having failed the "elected public official" test, Mr. Hinerman can be designated a public official only if he has "substantial responsibility for or control over the conduct of governmental affairs." *Gertz, supra* note 17, 418 U.S. at 335, n. 6, 94 S.Ct. at 3005 n. 6 (quoting *Rosenblatt, supra,* 383 U.S. at 85, 86 S.Ct. at 676). In this regard, the *Gazette* relies principally on Mr. Hinerman's state bar vice-presidency as proof of public official status. Yet, as an officer of the state bar, Mr. Hinerman exerted no control over government affairs. The state bar is merely an advisory body to the West Virginia Supreme Court of Appeals. The bar has no authority of its own. As requested by this Court, the state bar can propose changes to the various rules of the Court, but its role is never more than that of an assistant or advisor to this Court. A second vice-president in such a body hardly has "substantial responsibility" or control over government affairs.

In *Gertz, supra* note 17, the Supreme Court found Mr. Gertz to be a private individual rather than a public official even though he was a lawyer who had been a member and officer of the National Lawyers' Guild. Then, in *Lawrence v. Moss,*

639 F.2d 634 (10th Cir.1981), *cert. denied,* 451 U.S. 1031, 101 S.Ct. 3021, 69 L.Ed.2d 400 (1981), the plaintiff was considered to be a private figure, notwithstanding that he had served in numerous governmental capacities, including service as a member of Vice–President Agnew's staff, a deputy director of administration in the committee for reelection of the President, and as a "special assistant to the Assistant Administrator of the General Services Administration" in Washington, D.C.

Furthermore, even if circumstances could be imagined in which Mr. Hinerman would qualify as a public official for libel law purposes, this is not such a case because the editorial at issue in this case failed to identify Mr. Hinerman as a public official. When a defendant's defamatory statements "do not directly or impliedly identify the plaintiff as a public official," the public official doctrine is not available as a defense. *Bufalino v. Associated Press*, 692 F.2d 266, 273 (2d Cir.1982), *cert. denied,* 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). Although it is not necessary to identify a president, governor, U.S. senator, congressman, or other well-known public official as serving in a particular office, a private person like Mr. Hinerman who is only arguably a "public official" by virtue of his holding a low-level government or quasi-government position, must at least be identified in his public capacity before a media defendant may shield itself behind the special public official provisions of the libel law.

In *Bufalino, supra,* the plaintiff, a member of the Pennsylvania Bar who lived and practiced law in a community of approximately 7,000 people, was employed part-time by the community as borough solicitor at an annual salary of $3,500. Following the Pennsylvania gubernatorial election of 1978, then governor-elect Richard L. Thornburgh released to the press a list of campaign contributors. The plaintiff was identified on that list as having contributed $120. A news report appearing in the Associated Press stated that governor-elect Thornburgh had received campaign contributions from "several individuals with al-

leged mob ties." Among those persons named in the AP article was the plaintiff, who was described as "Charles Bufalino, Jr., an attorney who was related to Russell Bufalino, described by the Crime Commission as a Mafia boss."

On appeal from the district court's grant of summary judgment, the Associated Press argued, analogous to the *Gazette*'s argument here, that the appellant's performance of his duties as borough solicitor made him a public official and that "a town attorney's alleged mob ties 'touch on' his fitness for office and hence are covered by the public official doctrine." The Second Circuit, however, found it unnecessary to rule on whether the AP allegation "touched on" the appellant's fitness for office, and found that the AP stories did not identify the appellant as the holder of any public office:

> The stories described appellant merely as "an attorney." A reader without prior knowledge of appellant's status as Borough Solicitor would most likely, and correctly, assume from the description that appellant is engaged in the private practice of law. The description would not directly or impliedly inform the reader that appellant holds any public office.

*Bufalino* at 273. The Second Circuit held that because there was no showing that readers of the AP article would recognize appellant as a public official, the public official doctrine was inapplicable. *See also, Foster v. Larendo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *Ocala Star–Banner Co. v. Damron,* 221 So.2d 459 (Fla.App.1969), *appeal dismissed,* 231 So.2d 822 (Fla.1970), *rev'd on other grounds,* 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971) (defamatory article nowhere mentioned the plaintiff's status as mayor or as candidate for public office); *Guinn v. Texas Newspapers, Inc.,* 738 S.W.2d 303 (1987), *cert. denied,* 488 U.S. 1041, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989) (defamatory article made no refer-

ence to plaintiff's official capacity, and there was no proof that plaintiff, an elected justice of the peace, was known as a public official beyond the confines of his region, the actual malice standard did not apply).

In the present case, Mr. Hinerman, at the time of the libelous editorial, was a lawyer who worked and resided in Weirton, an area remote from the principal places of the *Gazette*'s circulation. The *Gazette* did not proffer any evidence that any member of the general public, on reading the editorial, would know that Mr. Hinerman held any public office. In particular, there was no evidence that a reader in Hancock or Brooke Counties would know of Mr. Hinerman's status as a second vice-president in the state bar (or any other office). The *Gazette* editorial itself makes absolutely no reference to Mr. Hinerman as anything other than a "lawyer" or "UMW attorney." Consequently, should this case be retried, we hold that it must be retried under the negligence standard that applies to the libel of a private individual.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Brooke County is affirmed.

Affirmed.

MILLER, Justice, dissenting:

In my more than thirty-five years as a trial lawyer and as a Judge on this Court, I have never seen a major case so badly botched. It contains a virtual Augean stables' worth of error and surplusage.[1] These errors range from irrelevant denigrations of the *Gazette* to important omissions, *e.g.,* the majority's failure to quote the *Gazette*'s newspaper article. This article was admitted by the parties to be accurate, and it was the basis for the editorial at issue. The reason for this omission is obvious. If the two documents are compared, as is required by the First Amendment, there can be no finding of any substantial inaccuracy. As a consequence, there could be no libel, and, thus, the $375,-

---

1. The problem with the Augean stables is briefly outlined in Bulfinch's Mythology 118 (Modern Library Edition): "Another labour (of Hercules) was the cleaning of the Augean stables. Augeas, King of Elis, had a herd of three thousand oxen, whose stalls had not been cleaned for thirty years."

000 verdict for compensatory and punitive damages would have to be set aside.

Though the majority takes pains to offer voluminous social commentary, it fails to address the controlling issue in the case—whether the *Gazette* is privileged against a libel suit because of its right to fairly and accurately report on official proceedings. The majority must manufacture legal authority to reach its stunning conclusion that the current United States Supreme Court has a diminished interest in media libel cases. For this proposition, the majority relies on twenty denials of certiorari by the United States Supreme Court. *See* Maj.Op. at 169 n. 17, 423 S.E.2d at 572 n. 17. However, in fourteen of these cases the media defendant won below, and the plaintiff or another defendant sought certiorari.[2] In three other cases, the media defendant had sought certiorari because it felt it deserved a summary judgment on liability.[3] Two of the cases are unpublished and it is impossible to determine their status.[4] In only one of the reported cases did the media defendant have a monetary judgment rendered against it.[5]

The majority errs again in its discussion of the role of a retraction in a libel case. It proceeds without citing any relevant law, and, as might be expected, ends up with an erroneous conclusion. Finally, I cannot help but note the majority's wolf-in-sheep's-clothing patronizing of the press. It assures the *Gazette* of its high regard, while simultaneously battering the paper with various low blows supplied by the most implacable media critics. Were it not for judicial immunity, I suspect the *Gazette* would have a good libel suit against the majority.

Libel cases against a media defendant inevitably concern the Freedom of the Press Clause of the First Amendment.[6] The freedom of the press is one of the most hallowed protections contained in our Constitution. It allows the press to act as the watchdog for our citizens and to report on, criticize, and otherwise bring to public attention the actions and conduct of the government.[7] Through the diligence of the press, we have the power to insist that our government remain true to Lincoln's ideal: "A government of the people, by the people, [and] for the people[.]"

## I.

### The Facts

This libel action is based on the *Gazette* editorial of May 20, 1983, which is quoted in the majority's opinion. Maj.Op. at 163–64, 423 S.E.2d at 566–67. As the majority acknowledges, the plaintiff's sole claim of libel rests on the editorial's statement that Levin asserted that "his lawyer took every penny, getting $12,000 for one day's work," and an alleged further defamation caused by the editorial's omission of the phrase "until the [fee] bill was paid." Maj. Op. at 164, 423 S.E.2d at 567. This latter phrase was contained in an earlier news article that was written by a *Gazette* staff

2. *See* footnote 17, *infra.*

3. *See* footnote 18, *infra.*

4. *See* footnote 19, *infra.*

5. *See* footnote 16, *infra.*

6. The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

7. The United States Supreme Court in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–92, 95 S.Ct. 1029, 1044–45, 43 L.Ed.2d 328, 347 (1975), outlined the role of the press in these terms:

"[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."

reporter and published on May 18, 1983. The editorial's assertion about the lawyer taking every penny and getting $12,000 for one day's work was a substantially accurate rendition of the information contained in the *Gazette*'s news article.

No claim was made in the libel suit that the news article was inaccurate or in any manner false.[8] The parties agree that the editorial was based on this news article.

Moreover, it is not disputed that the article was derived from the contents of a petition for appeal filed in this Court by Mr. Levin's appellate lawyer, Mr. Gold. No claim is made that the news article did not accurately reflect the contents of the petition for appeal.[9]

There is no question in my mind that the *Gazette* editorial accurately summarized its

8. The majority refuses to set out the newspaper article in its opinion because the article demonstrates the substantial accuracy of the editorial. The contents of the article, including its headline, are:

"Immigrant appeals lawyer's fee to court
By Mark Ward
Staff Writer

"A Russian immigrant who was assessed more than $12,000 in legal fees for a one-day hearing on a Workers' Compensation appeal won a review of his case by the state Supreme Court Tuesday.

"Sam Levin, a native of the Soviet Union who emigrated to Israel and then to the United States, is appealing a default judgment that Wheeling lawyer Raymond A. Hinerman received against him for the fees.

"Hinerman sued Levin for the fees last August and, after Levin neglected to answer the suit, received permission from Ohio County Circuit Judge Callie Tsapis to take 100 percent of Levin's monthly Workers' Compensation benefits until his fees are paid.

"Lawyer David Gold told the high court Tuesday that the fees appear to be excessive and said he was appalled that Levin, who is now staying with friends and family in Miami Beach, Fla. and has no source of income, is compelled to deliver his benefit checks to Hinerman.

"Levin emigrated from the Soviet Union to Israel in 1973, then traveled to the United States in 1975, the appeal petition states. He first came to Massachusetts, but because he was trained as a coal miner in the Soviet Union, decided to move to Wheeling where he got a job with Consolidated Coal Co. in April 1977.

"In October 1977 he suffered a heart attack and was unable to work.

"According to the petition, Hinerman, a former staff counsel for United Mine Workers District 6, represented Levin in the Workers' Compensation claim for free at first as a benefit of union membership.

"However, Levin was granted only 20 percent disability. Hinerman, meanwhile, quit the union but convinced Levin to retain him as a private attorney to bring the appeal. After a one-day hearing, the petition states, Levin was granted permanent total disability.

"Last July Hinerman sent Levin a bill for $4,201.88 for representing him in the hearing.

When Levin neglected to pay, Hinerman brought suit against Levin, Consolidation Coal Co., Employment Services Corp and Workers' Compensation Commissioner Gretchen Lewis for $12,088.54.

"In November, Levin wrote a letter to Judge Tsapis, saying that he could not afford to hire a lawyer, but felt that he owed Hinerman nothing. 'I am convinced that Mr. Hinerman used my ignorance and lack of skill in language and law to his advantage,' he wrote.

"Hinerman asked for a default judgment against Levin, and Judge Tsapis, ruling that Levin's request did not comply with court rules, approved it. The judge also ruled that Hinerman could attach 100 percent of Levin's Workers' Compensation benefits until the bill was paid.

"The petition also noted that Hinerman stated in a hearing that when Levin was flown from Florida for the appeal hearing that 'the costs in this case, to try to save Mr. Levin money, were charged to another client.... So he probably saved a good $1,000 in costs.'

"The petition asked that Levin be given an opportunity to defend himself, saying, 'An immigrant who must have all correspondence translated, who is in ill health, living on the charity of friends an [sic] family and ignorant of the legal process should be excused his neglect in not timely answering (the) complaint.'"

9. The petition for appeal filed by Attorney Gold contained these factual assertions, which were summarized in the *Gazette*'s news article and its editorial:

"A default judgment was granted to the plaintiff on November 9, 1982, against petitioner in the amount of Twelve Thousand Eighty–Eight Dollars and Fifty–Four Cents ($12,088.54) by the Circuit Court of Hancock County, the Honorable Callie Tsapis presiding, and your petitioner unsuccessfully sought to have that judgment vacated. Pursuant to said default judgment, said Court Ordered the attachment of 100% of petitioner's Workmen's Compensation benefits in favor of the plaintiff, a practicing attorney in Hancock County, West Virginia.

\* \* \* \* \* \*

"Petitioner is a native-born Russian who emigrated to Israel in 1973, and on to the

earlier news article. The thrust of the editorial was correct—that for one day's work Hinerman had charged Levin a legal fee in excess of $12,000. When Levin

United States in 1975. He first resided in Massachusetts, but because his training in Russia and Israel was in underground mining, he moved to Wheeling, West Virginia, in April, 1977, to work in the coal mines. In October, 1977, he was disabled by a heart attack which occurred in the course of his employment.

"As a member of The United Mine Workers of America (UMWA), petitioner's Workmen's Compensation claim was handled, without charge to him, by UMWA District 6 counsel. During the times pertinent hereto (March, 1981, to January, 1982), plaintiff served as District 6 counsel. During that time, petitioner was awarded a 20% disability rating for his injury; plaintiff, in his capacity as UMWA counsel, filed an appeal in July, 1981.

"In January, 1982, plaintiff resigned as District 6 counsel. The incoming counsel recommended to your petitioner that he retain plaintiff as his private attorney before the Workmen's Compensation Appeal Board. Plaintiff sent petitioner a letter which authorized the Workmen's Compensation Commissioner to send any award checks to plaintiff. Petitioner signed the 'authorization' on January 28, 1982, after moving to Miami Beach, Florida.

"According to defendant's testimony, when his landlord explained to him the consequences of the 'authorization' he had signed, petitioner revoked the authorization. On July 8, 1982, plaintiff sent petitioner a bill for Four Thousand Two Hundred One Dollars and Eighty–Eight Cents ($4,201.88) for services rendered on his one-day appeal.

"Plaintiff instituted the instant suit when petitioner failed to pay the bill. In his complaint, however, plaintiff sought payment of the statutory limit of twenty percent (20%) of benefits paid during a period of two hundred eight (208) weeks ($12,088.54) plus interest and costs. This amount was in addition to fees paid to plaintiff for work done on petitioner's case while plaintiff was employed by the UMWA.

"Petitioner testified that he was uncertain of the legal consequences of the suit against him and was unable to hire an attorney because of his financial condition. He did file *pro se* pleadings in an attempt to respond to the case against him, and following the entry of said judgment, persuaded instant counsel to move for the vacation of that judgment. These efforts were unsuccessful, leading to the prosecution of this appeal.

\* \* \* \* \* \*

"On November 1, 1982, petitioner, who apparently has no knowledge of the legal process, mailed a letter to the Circuit Court Judge of Hancock County outlining what he felt to be his defenses to the instant suit. He wrote that, 'There are no legal obligations between him and me.' Additionally, petitioner offered to appear before the Court and ask the Judge for her 'opinion' on the matter, apparently believing that his actions would suffice to delay or end any action against him.

"The Judge refused to recognize this and other *pro se* attempts to answer because they 'failed to comply with the Rules.' ...

\* \* \* \* \* \*

"On November 16, 1982, the Court granted plaintiff's Motion that 100 percent of petitioner's Workmen's Compensation benefits be paid directly to plaintiff until the amount of 20 percent of benefits already awarded, plus costs, had been taken by plaintiff. Only after plaintiff has been paid these sums will petitioner receive any of his award. The effect of this ruling is to give to the plaintiff, a practicing attorney, all of petitioner's income while the petitioner, who is totally disabled, has no source of income whatsoever."

The attorney's petition for appeal then reached several legal conclusions:

"The West Virginia Legislature has set a limit on the fee received by an attorney for his work in a Workmen's Compensation case. West Virginia Code § 23–5–5 reads, in pertinent part:

In no case shall the fee received by the attorney of such claimant or dependent be in excess of twenty percent of the benefits to be paid during a period of two hundred eight weeks.

"In providing a sanction for charging or receiving a fee in excess of the set maximum, the statute states that any contract entered into for more than 20 percent of the benefits to be paid during a period of two hundred eight (208) weeks 'shall be unlawful and unenforceable as contrary to the public policy of this state.' Furthermore, any fee charged *or received* by an attorney in violation thereof shall be deemed 'an unlawful practice and render the attorney subject to disciplinary action.' (Emphasis Added). Thus, in the instant case, the fee *received* by the plaintiff, although not charged under a contract with petitioner, nevertheless falls within the statutory prohibition. According to the explicit statutory language, then, the plaintiff's receipt of payment from the United Mine Workers of America, in addition to 20 percent of the petitioner's benefits during a period of two hundred eight (208) weeks exceeds the statutory maximum and is an 'unlawful practice' which should not be tolerated."

The petition further asserted:

"An immigrant who must have all correspondence translated, who is in ill health, living on the charity of his friends and family and ignorant of the legal process should be excused of his neglect in not timely answering plaintiff's complaint."

failed to properly answer the fee suit, Hinerman obtained a default judgment and was able to seize 100 percent of Levin's workers' compensation benefits. Although the editorial did not use the phrase "until the [fee] bill was paid," there is no doubt that 100 percent of Levin's workers' compensation benefits were subjected to Hinerman's attachment. Thus, from Levin's viewpoint, he was not receiving a single penny of his workers' compensation benefits because every penny was going to the lawyer.

The gist or "sting" of the *Gazette* editorial was accurate. Whether the $12,000 default judgment would absorb the entire award is a matter that was never revealed. The majority expects, indeed requires, either the editorial writer or the *Gazette*'s reporter to make this calculation, though it would require the legal ability to understand the complicated law surrounding our workers' compensation program.

## II.

### *First Amendment Law*

In this case, the plaintiff was found by the trial court to be a public official because he held a variety of public offices. At the time the editorial was published, Mr. Hinerman was the municipal judge for the City of Weirton; a second vice-president of the West Virginia State Bar, an organization legislatively created and subject to the supervision of this Court; [10] and, finally, a member of the West Virginia Racing Commission. As a public official, Mr. Hinerman is prohibited from recovering damages for a defamatory falsehood, unless he can prove the statement was made with actual malice. Recently, the United States Supreme Court reaffirmed this standard in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14, 110 S.Ct. 2695, 2703, 111 L.Ed.2d 1, 14 (1990):

"In 1964, we decided in *New York Times Co. v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964)], that the First Amendment to the United States Constitution placed limits on the application of the state law of defamation. There the Court recognized the need for 'a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' ..." (Citation omitted).

*Milkovich* also recognized a vital procedural requirement of First Amendment libel law: An appellate court has an obligation to make an independent examination of the evidentiary record to determine if there were sufficient facts to constitute libel.[11] Thus, a jury verdict is not conclusive in a First Amendment libel case.

More recently in *Masson v. New Yorker Magazine, Inc.*, —— U.S. ——, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), the United States Supreme Court acknowledged again that when a public figure or official is a plaintiff in a libel action, the plaintiff must prove the libel by clear and convincing evidence.[12] More importantly, *Masson* ex-

---

**10.** *See* W.Va.Code, 51–1–4a.

**11.** The applicable language in *Milkovich*, 497 U.S. at 17, 110 S.Ct. at 2705, 111 L.Ed.2d at 16–17, is:

"The Court has also determined 'that in cases raising First Amendment issues ... an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." ' *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 [104 S.Ct.1949, 1958, 80 L.Ed.2d 502] (1984) (quoting *New York Times,* 376 U.S., at 284–286 [84 S.Ct. at 728–29, 11 L.Ed.2d 686]). The question whether the evi-

dence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.' *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685 [109 S.Ct. 2678, 2694, 105 L.Ed.2d 562, 587] (1989)."

**12.** *Masson* addressed whether summary judgment should have been granted for the defendant magazine, but the same burden applies at trial:

"The parties agreed that petitioner was a public figure and so could escape summary judgment only if the evidence in the record would permit a reasonable finder of fact, by clear and convincing evidence, to conclude that re-

plained in detail how the falsity of a publication was to be determined:

"The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. See Restatement (Second) of Torts § 563, Comment c (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 776 (5th ed. 1984). It overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth, and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.' B. Witkin, Summary of California Law, § 495 (9th ed. 1988) (citing cases). In this case, of course, the burden is upon petitioner to prove falsity. See *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 [106 S.Ct. 1558, 1563, 89 L.Ed.2d 783, 792] (1986). The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' *Heuer v. Kee*, 15 Cal.App.2d 710, 714, 59 P.2d 1063, 1064 (1936); see also *Alioto v. Cowles Communications, Inc.*, 623 F.2d 616, 619 (CA9 1980); *Maheu v. Hughes Tool Co.*, 569 F.2d 459, 465–466 (CA9 1978). Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' R. Sack, Libel, Slander, and Related Problems 138 (1980); see, e.g., *Wheling v. Columbia Broadcasting System, Inc.*, 721 F.2d 506, 509 (CA5 1983); see generally R. Smolla, Law of Defamation § 5.08 (1991). Our definition of actual malice relies upon this historical understanding." —— U.S. at ——, 111 S.Ct. at 2432–33, 115 L.Ed.2d at 472–73.

spondents published a defamatory statement with actual malice as defined by our cases. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

These constitutional commands are made obligatory on states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Until today's opinion, we have followed these commands with commendable fidelity, as reflected by Syllabus Points 1 through 4 of *Dixon v. Ogden Newspapers, Inc.*, 187 W.Va. 120, 416 S.E.2d 237 (1992):

"1. ' "[A] public official ... can sustain an action for libel only if he can prove that (1) the alleged libelous statements were false or misleading; (2) the statements tended to defame the plaintiff and reflect shame, contumely, and disgrace upon him; (3) the statements were published with knowledge at the time of publication that they were false or misleading or were published with a reckless and willful disregard of truth; and, (4) the publisher intended to injure the plaintiff through the knowing or reckless publication of the alleged libelous material." Syllabus Point 1, in part, *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, 95 A.L.R.3d 622, *cert. denied*, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975).' Syllabus point 4, *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986).

"2. 'Under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1969) [ (1964) ], whenever there is a First Amendment defense to actions under state law, the state court is required to be a judge of both the facts and the law....' Syllabus point 2, in part, *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216 (1981).

"3. 'A court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning.' Syllabus point 6, *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986).

255–256 [106 S.Ct. 2505, 2513–2514, 91 L.Ed.2d 202, 216] (1986)." —— U.S. at ——, 111 S.Ct. at 2428, 115 L.Ed.2d at 467.

"4. In order to sustain an action for libel, a public official must present clear and convincing evidence that the media defendant acted with actual malice. Actual malice must be proven with convincing clarity."

*See also Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986); *Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216 (1981).

Thus, under First Amendment law, the plaintiff had to prove by clear and convincing evidence each of the following elements to recover damages against the *Gazette*. First, the plaintiff had to prove that the editorial's statements were, in the language of *Masson*, false or misleading to the extent that the true facts would have produced a " 'different effect on the mind of the reader' " because "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' " —— U.S. at ——, 111 S.Ct. at 2433, 115 L.Ed.2d at 472. (Citations omitted).

Second, the editorial must be shown to have defamed the plaintiff. Third, it must be shown that the statements were published with the knowledge that they were false, misleading, or published with reckless and willful disregard of the truth. Finally, the plaintiff must show that the publisher of the editorial intended to injure the plaintiff through the knowing or reckless publication of the alleged libelous material. *See* Syllabus Point 1, *Dixon v. Ogden Newspapers, Inc., supra.*

As outlined above, it is at the time of the publication of the alleged libel that the knowledge of falsity and recklessness and willful disregard of the truth is tested. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Thus, the majority's attempt to impute falsity and reckless disregard by reciting conversations and events that colleagues of Mr. Hinerman had with employees of the *Gazette* after the editorial was published are not relevant.[13] Nor is its reliance on the supposed bias of Mr. Chilton, the *Gazette* editor, against lawyers of any legal consequence. As the Supreme Court made clear in *Masson v. New Yorker Magazine, Inc.*, —— U.S. at ——, 111 S.Ct. at 2429, 115 L.Ed.2d at 468, ill will is not equivalent to actual malice for First Amendment purposes: "Actual malice under the New York Times standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. *See Greenbelt Cooperative Publishing Assn., Inc. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)."

Another critical piece of First Amendment libel law comes into play in this case because the editorial was based on facts that had initially been obtained by a news reporter from a petition for appeal filed in this Court. There is a privilege under the First Amendment for fair and accurate reporting on official proceedings. Though some of the facts asserted in an official proceeding may be untrue, the media is not liable for reporting them.[14]

For example, in *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), *Time Magazine* was sued for libel by a

**13.** The most egregious fact left out of the petition for appeal was that Mr. Levin was subsequently awarded a permanent total disability award. Under our workers' compensation statute, Mr. Hinerman was then entitled to a greater legal fee. For this reason, Mr. Levin lost his appeal. *See Hinerman v. Levin*, 172 W.Va. 777, 310 S.E.2d 843 (1983).

**14.** Incredibly, the majority's entire discussion of this important privilege to report official proceedings is contained in three paragraphs. Maj. Op. at 174–75, 423 S.E.2d at 577–78. As its only authority, the majority cites Section 611 of the *Restatement (Second) of Torts* and comment f under this section. The majority makes no attempt to analyze any of the First Amendment cases discussing this privilege. This lapse is understandable because to intelligently discuss this law would require a conclusion that the libel verdict cannot be sustained. In this unbridled ignorance, the majority writer, a devotee of Tennyson's *Idylls of the King*, "Merlin and Vivian," *see* Maj.Op. at 172, 423 S.E.2d at 575, might take heed of this thought from the same work by Tennyson: "Blind and naked ignorance delivers brawling judgments unashamed, on all things all day long."

police officer. He claimed that *Time*'s article had defamed him because it failed to inform the reader that the facts surrounding an episode of police brutality were obtained from allegations in a civil action filed against the plaintiff. *Time*'s article was based on a report issued by the United States Commission on Civil Rights which dealt, in part, with police brutality. In that report, the Commission outlined what it said were the alleged facts in eleven typical cases of police brutality. The Commission's report stated that in none of the cases could it be determined conclusively whether the complainants or the police were correct in their statements.

The Supreme Court refused to find that *Time*'s omission of this information by its failure to use the term "allegation" in the news article made the article false:

"In light of the totality of what was said in Justice, we cannot agree that, when Time failed to state that the Commission in reporting the Monroe incident had technically confined itself to the allegations of a complaint, Time engaged in a 'falsification' sufficient in itself to sustain a jury finding of 'actual malice.'" 401 U.S. at 289, 91 S.Ct. at 639, 28 L.Ed.2d at 53.

Subsequently, in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 492–93, 95 S.Ct. at 1045, 43 L.Ed.2d at 348, the Supreme Court further explained the purpose of this First Amendment privilege:

"The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized. This Court, in an opinion written by Mr. Justice Douglas, has said:

'A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. *Those who see and hear what transpired can report it with impuni-*

*ty....' Craig v. Harney*, 331 U.S. 367, 374 [67 S.Ct. 1249, 1253, 91 L.Ed. 1546, 1551] (1947). (emphasis added)."

In *Lavin v. New York News, Inc.*, 757 F.2d 1416 (3rd Cir.1985), the newspaper published a summary of a 165–page F.B.I. agent's affidavit filed with a federal court in order to obtain search warrants. According to the news article, F.B.I. informants indicated that several police officials were involved in taking bribes from the mob. The article's headline stated, "The Mob: Best Cops Money Can Buy." The article included the plaintiff's picture and that of another police officer and both were identified by their names and titles. The news article did contain a statement by the plaintiff saying that he had not accepted bribes.

The central controversy in the libel action was whether the article together with its headline and photograph wrongly accused the plaintiff of committing a crime, when there was no specific statement in the affidavit that Lavin had accepted a bribe. The Court of Appeals for the Third Circuit disposed of the issue by finding the article not libelous because it was substantially accurate, and the newspaper could not be held accountable for factual inaccuracies in the affidavit itself:

"In the final analysis, the issue is not whether the affidavit included direct evidence of the payment of money to plaintiff, but whether, fairly read, the affidavit asserts that the FBI had concluded that plaintiff was corrupt. In our view, the affidavit undoubtedly amounts to an assertion that plaintiff was directly involved in a corrupt relationship with members of organized crime in the Bayonne, New Jersey, area.

"We hasten to add that, given the present procedural posture of the case, we must assume that the FBI affidavit was false in every particular, and that plaintiff was and is entirely innocent, and was merely carrying out appropriately his duties as head of the Internal Affairs Department. But whether the FBI agents misinterpreted the situation, had incorrect information, or even conscious-

ly misstated the facts in the affidavit, there can be no liability on the part of the defendants for republishing the contents of an official document, so long as their account is reasonably accurate and fair. We hold, as a matter of law, that it was." 757 F.2d at 1420.

*See also Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287 (D.C.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Edwards v. National Audubon Soc'y, Inc.,* 556 F.2d 113 (2nd Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); *Schiavone Constr. Co. v. Time, Inc.,* 735 F.2d 94 (3d Cir.1984); *Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249 (4th Cir.1988); *Clark v. American Broadcasting Co.,* 684 F.2d 1208 (6th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983); *Schuster v. U.S. News & World Report, Inc.,* 602 F.2d 850 (8th Cir.1979); *Green Acres Trust v. London,* 141 Ariz. 609, 688 P.2d 617 (1984); *Huszar v. Gross,* 468 So.2d 512 (Fla.App.1985); *Newell v. Field Enters., Inc.,* 91 Ill.App.3d 735, 47 Ill.Dec. 429, 415 N.E.2d 434 (1980); *Hoeflicker v. Higginsville Advance, Inc.,* 818 S.W.2d 650 (Mo.App.1991); *Cox v. Lee Enters., Inc.,* 222 Mont. 527, 723 P.2d 238 (1986); *Oweida v. The Tribune–Review Publishing Co.,* 410 Pa.Super. 112, 599 A.2d 230 (1991), *appeal denied,* 529 Pa. 670, 605 A.2d 334 (1992); *Padgett v. Sun News,* 278 S.C. 26, 292 S.E.2d 30 (1982); *Mark v. KING Broadcasting Co.,* 27 Wash. App. 344, 618 P.2d 512 (1980), *aff'd sub nom., Mark v. Seattle Times,* 96 Wash.2d 473, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982).

This very issue was involved in our recent case of *Dixon v. Ogden Newspapers, Inc., supra,* which the majority elects to ignore. I can understand why—*Dixon* is against the majority's current holding. In *Dixon,* we unanimously agreed that the newspaper had not libeled two police officers even though its article about a magistrate court trial suggested that the police

officers may have disclosed an impending vice raid to a tavern owner. We found, after an independent review of the record, that the article was substantially accurate.

In my view, this law is dispositive of the case. The *Gazette*'s initial news article on the Levin appeal to this Court was a fair and accurate summary. The editorial's single omission was its failure to state that Levin's workers' compensation checks were attached and paid to Attorney Hinerman "only until the [fee] bill was paid." The undisputed fact was that Levin received no funds until Attorney Hinerman's fee bill was paid. Unless the reporter or the editorial writer was an expert on workers' compensation award payments, there was no way for either of them to know whether Levin's workers' compensation award would even be sufficient to pay his legal fees.

Moreover, the real harm was that the attachment took all of Levin's source of funds.[15] He was impoverished and without any income. Consequently, omitting the phrase "until the bill was paid" created no defamatory implication—indeed, this phrase would have added nothing because one would assume that an execution could not collect more than the amount of the debt owed.

If the *Gazette*'s editorial is tested in light of its privilege to report with substantial accuracy documents filed in official proceedings, then I have no doubt that it has met this standard. Under the constitutional prerogative of an appellate court to review First Amendment free press claims, the only conclusion is that there was no material omission and, therefore, no liability on the part of the *Gazette.*

### III.

#### *Other Errors*

#### A.

I reject the majority's dubious assertion that the current membership of the United

---

**15.** Because workers' compensation benefits are not wages, there was no limit on the amount that could be taken from any one check.

States Supreme Court has a "waning enthusiasm for reviewing liable judgments against media defendants." Maj.Op. at 169, 423 S.E.2d at 572. This remarkable insight is buttressed by a list of twenty denials of certiorari in the third paragraph of footnote 17 of the majority opinion. Maj.Op. at 169, 423 S.E.2d at 573. However, only one of these cases involved a monetary judgment against a media defendant.[16]

In fourteen of the cases, the media defendant was exonerated from the alleged libel, and the plaintiff or another defendant sought certiorari to the Supreme Court.[17] In three of these cases, the media defendant obtained a summary judgment, which was reversed on appeal, and the media appealed to the Supreme Court.[18] Two of the cases are unpublished opinions, and, therefore, the facts are unreported.[19] These denials of certiorari hardly reflect a studied indifference to the media's libel appeals by the Supreme Court. What it does demonstrate is the shallowness of the majority's research and its "waning enthusiasm" hypothesis.

Moreover, recent United States Supreme Court cases do not demonstrate that a retreat is occurring. I have already cited *Milkovich v. Lorain Journal Co.,* where Chief Justice Rehnquist made a detailed summary affirming pre-existing First Amendment law. Certainly, *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. at 688, 109 S.Ct. at 2696, 105 L.Ed.2d at 589, cannot be deemed a retreat inasmuch as the Court strongly reiterated the reckless disregard standard and its relation to the duty to investigate:

"A 'reckless disregard' for the truth, however, requires more than a departure from reasonably prudent conduct. 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' *St. Amant [v. Thompson],* 390 U.S. at 731 [88 S.Ct. at 1325, 20 L.Ed.2d at 267]. The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of ... probable falsity.' *Garrison v. Louisiana,* 379 U.S.

16. *Ball v. E.W. Scripps,* 801 S.W.2d 684 (Ky. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991).

17. *Reuber v. Food Chem. News, Inc.,* 925 F.2d 703 (4th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Smith v. McDonald,* 895 F.2d 147 (4th Cir.), *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 29 (1990); *Newton v. National Broadcasting Co.,* 930 F.2d 662 (9th Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991); *Unelko Corp. v. Rooney,* 912 F.2d 1049 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991); *Mosesian v. McClatchy Newspaper, Inc.,* 233 Cal.App.3d 1685, 285 Cal.Rptr. 430 (1991), *cert. denied,* — U.S. —, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992); *McCoy v. Hearst Corp.,* 227 Cal.Rptr.3d 1657, 278 Cal.Rptr. 596 (1991), *cert. denied,* — U.S. —, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Fletcher v. San Jose Mercury News,* 216 Cal. App.3d 172, 264 Cal.Rptr. 699 (1989), *cert. denied,* 498 U.S. 813, 111 S.Ct. 51, 112 L.Ed.2d 26 (1990); *Locricchio v. Evening News Ass'n,* 438 Mich. 84, 476 N.W.2d 112 (1991), *cert. denied,* — U.S. —, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Diesen v. Hessburg,* 455 N.W.2d 446 (Minn.1990), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *Ward v. Roy H. Park Broadcasting,* 328 N.C. 577, 403 S.E.2d 522, *cert. denied,* — U.S. —, 112 S.Ct.

190, 116 L.Ed.2d 151 (1991); *Immuno AG v. Moor-Jankowski,* 77 N.Y.2d 235, 567 N.E.2d 1270, 566 N.Y.S.2d 906, *cert. denied,* — U.S. —, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991); *Dale v. Ohio Civil Serv. Employees Ass'n,* 57 Ohio St.3d 112, 567 N.E.2d 253, *cert. denied sub nom., Dale v. American Federation of State, County & Mun. Employees, Int'l AFL–CIO,* — U.S. —, 111 S.Ct. 2853, 115 L.Ed.2d 1021 (1991); *Celebrezze v. Netzley,* 51 Ohio St.3d 89, 554 N.E.2d 1292, *cert. denied,* 498 U.S. 967, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990); *Villarreal v. Harte–Hanks Communications, Inc.,* 787 S.W.2d 131 (Tex.App.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1316, 113 L.Ed.2d 249 (1991).

18. *Barber v. Perdue,* 194 Ga.App. 287, 390 S.E.2d 234, *cert. denied,* 498 U.S. 967, 111 S.Ct. 430, 112 L.Ed.2d 414 (1990); *Warford v. Lexington Herald-Leader Co.,* 789 S.W.2d 758 (Ky.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991); *Spence v. Flynt,* 816 P.2d 771 (Wyo. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1668, 118 L.Ed.2d 388 (1992).

19. *Worldwide Church of God v. McNair,* No. 91-495 (Cal.App., 2d Dist., —), *cert. denied,* — U.S. —, 112 S.Ct. 380, 116 L.Ed.2d 331 (1992); *Birsner v. Sivalignham,* No. 91-1382 (Cal.App., 2d Dist., —), *cert. denied,* — U.S. —, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992).

[64] 74 [85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964)]. *As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. See St. Amant,* [390 U.S.] at 731, 733 [88 S.Ct. at 1326, 20 L.Ed.2d at 268]. *See also Hunt v. Liberty Lobby,* 720 F.2d 631, 642 (CA11 1983); *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 918 (CA6 1982). In a case such as this involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' *St. Amant,* [390 U.S.] at 732 [88 S.Ct. at 1326, 20 L.Ed.2d at 268]." (Emphasis added).

The majority's misunderstanding of *Harte–Hanks* and the emphasized language is particularly apparent in this case. The majority rests its ultimate conclusions on impermissible standards such as the *Gazette's* supposed duty to call Attorney Hinerman in advance of publishing the editorial.

Finally, *Masson v. New Yorker Magazine, Inc., supra,* is the Court's latest statement, and it spells out in elaborate detail that falsity cannot be found by minor inaccuracies that do not alter the thrust of the asserted libel. Had the majority followed these recent United States Supreme Court cases, it would have concluded there was no libel as a matter of law.

B.

Even though I firmly maintain that there was, as a matter of law, no proof of falsity in the *Gazette's* editorial in light of its privilege to fairly and accurately report official proceedings, I am constrained to express my disagreement with Part IV of the majority opinion.

First, the majority suggests that the *Gazette's* failure to publish an unequivocal retraction is conclusive proof of malice. This suggestion is simply contrary to established libel law. The general rule is that the presence of actual malice must be determined at the time of the publication of the alleged defamatory statement. *See, e.g., New York Times v. Sullivan, supra; Fitzgerald v. Penthouse Int'l. Ltd.,* 691 F.2d 666 (4th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983); *Peisner v. Detroit Free Press, Inc.,* 104 Mich.App. 59, 304 N.W.2d 814 (1981), *modified on other grounds,* 421 Mich. 125, 364 N.W.2d 600 (1984); *Dupler v. Mansfield Journal Co.,* 64 Ohio St.2d 116, 413 N.E.2d 1187 (1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 973 (1981). *See generally,* R.A. Smolla, *Law of Defamation* § 3.22(1) (1990).

The Supreme Court in *New York Times Co. v. Sullivan, supra,* stated that the failure to retract was not alone sufficient to establish malice. The court left open whether the lack of a retraction "may ever constitute such evidence [of malice]...." 376 U.S. at 286, 84 S.Ct. at 729, 11 L.Ed.2d at 710.[20] There are cases where courts have held that under certain circumstances the failure to retract may be relevant proof on the issue of actual malice, *see, e.g., Golden Bear Distrib. Sys. v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir.1983); *Burnett v. National Enquirer, Inc.,* 144 Cal.App.3d 991, 193 Cal.Rptr. 206 (1983), *appeal dismissed,* 465 U.S. 1014, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984). *See generally* § 580A, comment d, *Restatement (Second) of Torts* (1977).

**20.** The discussion of this issue in *Sullivan,* 376 U.S. at 286–87, 84 S.Ct. at 729, 11 L.Ed.2d at 710, is:

"Whether or not a failure to retract may ever constitute such evidence, there are two reasons why it does not here. *First,* the letter written by the Times reflected a reasonable doubt on its part as to whether the advertisement could reasonably be taken to refer to respondent at all. *Second,* it was not a final refusal, since it asked for an explanation on this point—a request that respondent chose to ignore. Nor does the retraction upon the demand of the Governor supply the necessary proof. It may be doubted that a failure to retract which is not itself evidence of malice can retroactively become such by virtue of a retraction subsequently made to another party. But in any event that did not happen here, since the explanation given by the Times' Secretary for the distinction drawn between respondent and the Governor was a reasonable one, the good faith of which was not impeached."

There is also authority for the proposition that a prompt retraction may be used by a defendant as evidence of lack of actual malice. *See, e.g., Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987); *Hoffman v. Washington Post Co.*, 433 F.Supp. 600 (D.D.C.1977), *aff'd*, 578 F.2d 442 (1978); *Sweaney v. United Loan & Fin. Co.*, 205 Kan. 66, 468 P.2d 124 (1970); *Peisner v. Detroit Free Press, supra*. Moreover, the United States Supreme Court in *New York Times v. Sullivan* reasoned that the refusal of the *Times* to retract as to Mr. Sullivan reflected its reasonable belief that it had not defamed him. *See* footnote 20, *supra*.

Finally, libel law recognizes that a retraction, aside from possible relevance to the malice question, may also be used to mitigate damages. *See, e.g., Sweaney v. United Loan & Fin. Co., supra. See generally* R. Smolla, *Law of Defamation* at § 9.10[9]. The right to have damages mitigated through a retraction is specifically authorized in W.Va.Code, 57–2–4 (1923).[21] We have not had occasion to discuss this statute, but clearly it recognizes that an apology will mitigate the plaintiff's damages.

In view of the foregoing law, which the majority has ignored, I find its treatment of the ameliorating effect of a retraction to be erroneous. At the very least, a retraction by a media defendant can be introduced to counter the plaintiff's claim that the publication was made with actual malice or a reckless disregard for its truth. Moreover, where such a good faith retraction is shown, it will mitigate the damages, and, in my view, insulate a media defendant from a punitive damage award.

## C.

Perhaps in recognition of the paucity of the evidence to support his case as a public official, the appellee argues at some length through his cross-assignment of error that he is a private person and, therefore, is not required to meet the rigorous test of *New York Times Co. v. Sullivan, supra*. The majority avoids deciding this issue by jumping to its conclusion that the test was met. However, in *obiter dictum*, the majority intimates some misgivings about this conclusion by saying "should a retrial become necessary, this issue will become important." Maj.Op. at 179, 423 S.E.2d at 582. It then proceeds to find Mr. Hinerman to be a private figure.

Even if one assumes that attorney Hinerman was a private person, this status would still not support his judgment under *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). There, the Supreme Court, while recognizing that a private person need not demonstrate that a publication was made with actual malice or reckless disregard of the truth, held that the plaintiff was still required to "bear the burden of showing falsity, as well as fault, before recovering damages." 475 U.S. at 776, 106 S.Ct. at 1563, 89 L.Ed.2d at 792. More recently this rule was acknowledged in *Milkovich v.*

---

21. W.Va.Code, 57–2–4 (1923), states:

"In any action for defamation, the defendant may justify by alleging and proving that the words spoken or written were true, and after notice in writing of his intention to do so (given to the plaintiff at the time of, or for, pleading to such action) may give in evidence in mitigation of damages that he made or offered an apology to the plaintiff for such defamation before the commencement of the action, or as soon afterwards as he had an opportunity of doing so, in case action shall have been commenced before there was an opportunity of making or offering such apology."

As pointed out in R. Smolla, *Law of Defamation* at § 9.12[2][a], many states have enacted retraction statutes, and in footnotes 151 and 152 to this section, these statements are made:

"[151] Robert Sack has counted 33. R. Sack, *Libel, Slander and Related Problems*, § VIII.2, at 372 (1980). Sack's overview of the various state approaches to retraction is excellent.

"[152] California, for example, follows the majority approach and provides only for certain media defendants in its retraction statute, while Connecticut, Louisiana, Maine, Massachusetts, Nebraska, Texas, and West Virginia apply their statutes to all defendants. *Compare* Cal.Civ.Code § 48a (West 1954), *with* Conn.Gen.Stat.Ann. § 52–237 (West 1960); La.Civ.Code Ann. Art. 2315.1 (West 1979); Me.Rev.Stat.Ann. tit. 14 § 153 (1965); Mass. Gen.Laws Ann. ch. 231, § 93 (1956); Mich. Stat.Ann. § 600.2911 (1962); Neb.Rev.Stat. § 25–840.01 (1975); Tex.Rev.Civ.Stat.Ann. art. 5430 (Vernon 1958); W.Va.Code § 57–2–4 (1966)."

*Lorain Journal Co.,* 497 U.S. at 15–16, 110 S.Ct. at 2704, 116 L.Ed.2d at 16, where the Supreme Court reiterated the foregoing statement.

As earlier pointed out, this entire libel rests upon the omission of a single phrase, "until the [fee] bill was paid," in the *Gazette*'s editorial that otherwise accurately set out the facts contained in its news article. There is no question that the news article and the editorial stated Hinerman's attachment took 100 percent of Levin's compensation payments. Thus, while the attachment existed, Levin did not receive one penny of his compensation award. While lawyers may quibble over how long this period of no payments would last for Mr. Levin, common sense would compel the conclusion that during this period, Mr. Levin received nothing. This was the obvious meaning of the editorial. It was not false in any material regard, and, as a consequence, Mr. Hinerman, even as a private citizen, is not entitled to recover under *Philadelphia Newspapers, Inc. v. Hepps,* *supra,* and its progeny.

### IV.

I can only conclude that the significant errors contained in the majority opinion may be rectified in a further appeal to the United States Supreme Court. It is unfortunate that the majority is unwilling to faithfully apply First Amendment law, sworn as we are as judges to uphold the Constitution of the United States. While today's opinion goes against the *Gazette,* it exposes every media organization in this State to its pernicious reasoning. Thus, I echo the words of the seventeenth century poet, John Donne: "Never send to know for whom the bell tolls; it tolls for thee." [22]

I am authorized to state that Justice BROTHERTON joins me in this dissent.

22. *Devotions Upon Emergent Occasions,* "Meditation XVII."